```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/5/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                    :
WCA HOLDINGS III, LLC,                                              :
                                                                    :
                                        Plaintiff,                  :          1:20-cv-07472-GHW
                                                                    :
                        -against-                                   :
                                                                    :          MEMORANDUM OPINION
PANASONIC AVIONICS CORPORATION,                                    :              AND ORDER
                                                                    :
                                        Defendant.                  :
                                                                    :
-------------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

Plaintiff WCA Holdings III, LLC ("WCA") is the owner of a private aircraft that Defendant

Panasonic Avionics Corporation ("Panasonic") agreed to outfit with the latest and greatest in-flight

internet, cabin management, and entertainment systems.  After entering into the original agreement

in 2010, Panasonic struggled to deliver on its promises.  Yet the parties maintained their optimism,

slogging through the next 10 years with four additional agreements, extending the promised

completion date and adding promises of yet more updates to the aircraft.  It was only in 2020 that

the parties accepted that their deal had imploded, and the aircraft was left with an obsolete, poorly

functioning in-flight system.  In a cautionary tale of over-optimism, many of WCA's claims must

now be dismissed as too little, too late.  For the reasons set forth below, Panasonic's motion to

dismiss is GRANTED IN PART AND DENIED IN PART.

I.      **BACKGROUND**[1]

        A.      **The Original Agreement**

        WCA owns a Boeing 737-700 BBJ aircraft (the "Aircraft") and operates it as a private

business aircraft.  Dkt. No. 27 ("Am. Compl.") ¶¶ 1, 12.  Panasonic is engaged in the business of

---

[1] Unless otherwise noted, the facts are drawn from the amended complaint, and are accepted as true for the purposes of
this motion to dismiss.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet

engineering and designing in-flight telecommunications and entertainment systems for private aircraft. *Id.* ¶ 13.  In June 2010, WCA and Panasonic negotiated and entered into the General Terms Agreement Between Panasonic Avionics Corporation and WCA Holdings III, LLC (the "GTA"). *Id.* ¶ 14; Dkt. No. 35-2 (GTA).

Under the GTA, Panasonic agreed to equip the Aircraft with a new in-flight internet, cabin management, and entertainment system, in exchange for cash or in-kind payment by WCA.  Am. Compl. ¶¶ 1, 14–15.  Specifically, Panasonic agreed to provide a "Shipset eXConnect System" (alternatively, the "eXConnect System"), an antenna system that connected to a satellite in order to provide in-flight broadband internet service to the Aircraft  *Id.* ¶¶ 15.  In exchange, WCA agreed to pay $324,500 for the eXConnect system and various other prices for specific spare parts and monthly broadband service.  Am. Compl. ¶ 16; GTA Exh. A.

While the GTA is largely focused on the eXConnect System, the last exhibit to the GTA, titled "Additional Incentives," introduces the "eX1 System," a new cabin management and in-flight entertainment system.  Am. Compl. ¶ 19; GTA Exh. F ("In addition to the eXConnect shipset parts list . . . , Panasonic is pleased to offer a new cabin management/in-flight entertainment system . . . .").  The eX1 System promises a host of features, such as "[c]abin lighting, flight attendant call, and temperature control" and "[a]udio-video on demand (AVOD), streamed independently to each cabin zone, with high definition video available from a media file server." GTA Exh. F.  The exhibit lists the "retail price" of the eX1 System as $1.2 million, with an additional $560,000 in additional costs for engineering, certification, and labor, but offers the eX1 System for a total discounted price of $500,000.  *Id.*

---

that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court also considers the General Terms Agreement and its Amendments accompanying Defendant's motion to dismiss because they are written instruments that are integral to the amended complaint.  *See, e.g.*, *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

The GTA also includes provisions for Panasonic to obtain the necessary testing and certifications for the eXConnect and eX1 Systems, and permits Panasonic to use the Aircraft periodically for demonstration flights to show off Panasonic's new products.  *See* Am. Compl. ¶¶ 18, 20; GTA Exh. D; *id.* Exh. F.

The GTA contains various warranty provisions, including the following express warranties:

Panasonic represents and warrants to [WCA] that:

**6.1.1**  The Products shall be free from defects in material and workmanship for a period of thirty-six (36) months from the date of shipment of the Products.

**6.1.2**  For a period of one hundred eighty (180) days from the date of installation, the Software shall substantially operate in accordance with the applicable specification.

**6.1.3**  At the time of delivery to [WCA], the Products shall conform to Panasonic's applicable specifications and the applicable airworthiness authority rules, regulations and specifications which are in effect at such time.

. . .

**6.1.5**  The Services shall be performed in a good and workmanlike manner.

*Id.* § 6.1.  Section 7 of the GTA provides for several warranty exclusions, which include:

**7.2  <u>Software</u>.**  Panasonic does not warrant that the functions contained in the Software will meet [WCA's] requirements or that the operation of the Software will be uninterrupted or error free.

**7.3  <u>Disclaimer of Warranties</u>.  THE WARRANTIES SET FORTH IN THIS AGREEMENT ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, WHETHER ARISING FROM A COURSE OF DEALING, COURSE OF PERFORMANCE OR TRADE USAGE, OR WHETHER ORAL, WRITTEN, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE HEREBY WAIVED BY BUYER. . . .**

*Id.* § 7.

The terms "Products," "Software," and "Services" are separately defined in the GTA as follows:

> **1.3** "**Products**" shall mean the items set forth in **Exhibit A**.  Products are not delivered with downloadable Software or Interactive Application Software.
>
> **1.4** "**Services**" shall mean certain installation, integration, testing, certification, non-recurring engineering (NRE) and out-of-warranty repair services that Panasonic may perform for Buyer from time to time pursuant to this Agreement.
>
> . . .
>
> **1.6** "**Software**" shall mean Panasonic's proprietary operating software in object code format, which is embedded in or downloadable to the Products.  Software shall not include any Interactive Application Software.
>
> . . .
>
> **1.8** "**Workmanlike**" shall mean worthy of a good workman; "a competent job" and work will be done in accordance with accepted aviation industry standards.

*Id.* §§ 1.3–1.8.

### B.   Delayed Installation of the eX1 System

On or about May 25, 2012, Panasonic provided WCA with a completion schedule that represented that the installation of the eX1 System would be completed by September 20, 2012, provided that WCA delivered the Aircraft by July 16, 2012.[2]  Am. Compl. ¶ 23.  WCA timely delivered the Aircraft, but the installation of the eX1 System was not completed on time.  *Id.*

In fact, the installation of the eX1 System suffered a number of delays, engendering multiple extensions over the course of multiple amendments to the GTA (the "Amendments").  First, WCA and Panasonic entered into Amendment No. 1 to the GTA on October 19, 2012, under which Panasonic agreed to complete the installation of the eX1 System by December 20, 2012.  *Id.* ¶ 24; *see* Dkt. No. 35-3 ("Amendment 1") § 3.  As part of the consideration for extending the deadline by which Panasonic agreed to complete the installation, Amendment 1 extended the warranty periods

---

[2] It is not clear if and when the delivery and installation of the eXConnect System was completed.

for the "Products" and "Software" warranties, under Sections 6.1.1 and 6.1.2 of the GTA.  *See* Amendment 1 § 4.2 ("[The WCA] is hereby amended to delete Sections 6.1.1. and 6.1.2 thereof and to substitute the following in their stead[.]").

Amendment 1 also provides for "Equipment Upgrades" for the eX1 System, in further consideration of the extension:

> **4.3   Equipment Upgrade.**  Panasonic shall install in the Aircraft in September 2017 (or such other month as the parties may agree) any and all upgrades to the eX1 System then available, including touch screens, Blu-ray players, audio speakers, LCD cabin monitors, cabin handsets, system remote controls and related software.  All such upgrades to the eX1 System shall be covered by the warranty provided in Section 6 of the [GTA], as amended by this Agreement.  It is the intention of [WCA] and Panasonic that the costs of all such upgrades shall be exchanged for Demonstration Flights as described below.

> **4.4   Demonstration Flights.**  In the event that [WCA] agrees to provide Aircraft demonstration flights for Panasonic or its prospective customers, Panasonic shall pay to [WCA] an amount equal to . . . .

> . . .

> Panasonic acknowledges and agrees that nothing in this Amendment obligates [WCA] to provide Aircraft demonstration flights for Panasonic or its prospective customers and that the provision of such flights shall be solely at [WCA's] discretion . . . .

> . . .

> It is the intention of the parties that the Demonstration Flights will occur at an annual hour usage of approximately sixty (60) hours per year for a period of five years commencing on the Extended Completion Date.  Panasonic is not obligated to use the quantity of hours stated above.

*Id.* § 4.3–4.4; *see* Am. Compl. ¶ 26.

On November 16, 2012, WCA and Panasonic entered into Amendment No. 2 to the GTA, pursuant to which the installation date of the eX1 System was extended to February 15, 2013.  Am. Compl. ¶ 27; *see* Dkt. No. 35-4 ("Amendment 2") § 4.  In March 2013, the parties entered into Amendment No. 3 to the GTA, which further extended the installation date to May 19, 2013.  Am. Compl. ¶ 28; *see* Dkt. No. 35-5 ("Amendment 3") § 4.  Amendments 2 and 3 also extended the

"Products" and "Software" warranties.  *See* Amendment 2 §§ 5.2.1, 5.2.2; Amendment 3 §§ 5.2.1,

5.2.2.  Amendments 2 and 3 also contain an identical "Equipment Upgrade" section and the same

terms for "Demonstration Flights" as Sections 4.3 and 4.4 of Amendment 1.  Amendment 2 § 5.3;

Amendment 3 § 5.4.

### C.       Problems with the eXConnect and eX1 Systems

Panasonic finally completed the installation of the eX1 System in the Aircraft by May 19,

2013, the extended installation date provided for in Amendment 3.  Am Compl. ¶ 29; *see also* Dkt.

No. 35-6 ("Amendment 4") at 1.  WCA paid for the eX1 System through in-kind demonstration

flights and flight testing in the Aircraft pursuant to the GTA and its amendments.  Am Compl. ¶ 30.

However, the "combined eX1 and eXConnect system" did not "perform according to its

specifications or Panasonic's representation."  *Id.* ¶ 31.  Among other failures, the combined system

was unable to consistently provide streaming videos or television to the Aircraft or provide high-

definition video and other cabin-management system requirements, as was promised.  *Id.*  WCA

alleges that, "[o]n information and belief, theses failures occurred in part because Panasonic failed to

install the eX1 and eXConnect systems pursuant to Panasonic's own specifications, as indicated by

the failure of the systems to work as Panasonic itself expected and represented."  *Id.*  These failures

were numerous and continued over many years, dating from early installation through the present.

*Id.* ¶ 33.

WCA and Panasonic sought to resolve the issues and engaged in various communications

about the eXConnect and eX1 System failures.  *Id.* ¶ 32.  Panasonic engaged in warranty repairs on

the eXConnect and eX1 Systems, with mixed results.  *Id.* ¶ 33.  WCA alleges that, "[d]espite the

numerous efforts to resolve the failures in the combined eX1 and eXConnect system, Panasonic has

been unable or unwilling to put the eX1 and eXConnect systems in working condition it represented

and warranted."  *Id.* ¶ 35.

### D.      Failure to Provide the Equipment Upgrades

While the eX1 System was installed in May 2013, there still remained Panasonic's promise to install the Equipment Upgrades to the eX1 System.  Accordingly, on April 10, 2017, the parties entered into Amendment No. 4 to the GTA.  *Id.* ¶ 37; *see* Amendment 4.  In relevant part, Amendment 4 required that Panasonic provide a new, updated broadband controller (the "New Broadband Controller") on the Aircraft as well as the Equipment Upgrades, as follows:

> **3.  BROADBAND EQUIPMENT.**  Panasonic shall install the New Broadband Controller in the Aircraft at no cost to [WCA] on or prior to Flight Test No.5 set forth on <u>Schedule B</u> hereto.  The New Broadband Controller shall be covered by the warranty provided in Section 6 of [the GTA].  It is the intention of [WCA] and Panasonic that the costs of the New Broadband Controller shall be exchanged for the Flight Tests as described in Section 4 and the Compensation as described in Section 4.4.
>
>> **3.1.  Equipment Upgrades.**  Panasonic shall also install in the Aircraft in September 2017 (or such other month as the parties may agree) any and all upgrades to the eX1 System then available, including . . . .  All such upgrades to the eX1 System shall be covered by the warranty provided in Section 6 of [the GTA].  It is the intention of [WCA] and Panasonic that the costs of all such upgrades shall be exchanged for Demonstration Flights as described in Amendment 3, Section 5.4.
>
> . . .
>
> **6.  WARRANTY.**  Panasonic and [WCA] each agree that the term "Products" shall include the New Broadband Controller and any Equipment Upgrades referenced in Section 3.1.  Without limiting Section 6 of [the GTA] and notwithstanding the expiration, termination or cancellation of the [GTA], Panasonic represents to [WCA] that the New Broadband Controller and any Equipment Upgrades shall be free from defects in material and workmanship for a period commencing on the date of installation (the "Installation Date") ending on the later to occur of (a) the date that is sixty (60) months after the Installation Date or (b) the date that ownership of the Aircraft is transferred to an entity that is not controlled by or is under common control with [WCA].

Amendment 4 §§ 3, 6.  WCA asserts that "the New Broadband Controller and Equipment Upgrades were intended by the parties to be paid for via in-kind test flights to obtain [Federal Aviation Administration] certification and demonstration flights for potential Panasonic customers, or alternatively, for cash payment by WCA pursuant to the terms of Exhibit F to the 2010 GTA."  Am.

Compl. ¶¶ 38–39.  In other words, WCA believed that it "agreed to and was obligated to pay for New Broadband Controller and Equipment Upgrades through such test flights, demonstration flights and/or cash payments."  *Id.* ¶ 39.

Panasonic did not complete the installation of the Equipment Upgrades by the end of September 2017, as promised—nor did the parties agree on a new installation date.  *Id.* ¶ 41–42. Instead, Panasonic implicitly acknowledged that it does not have the ability or willingness to provide the Equipment Upgrades to WCA.  *Id.* ¶ 43.

E.    **Procedural History**

WCA commenced suit against Panasonic on September 11, 2020.  Dkt. No. 1.  WCA then amended its complaint, which is now the operative complaint in this matter.  Dkt. No. 27.  WCA asserts the following causes of action: (1) breach of contract for (a) failure to install the eXConnect and eX1 Systems "in a fully working condition and in the manner described in the GTA and related specifications for the eX1 system," (b) breach of the warranty provisions of the GTA "by failing and refusing to repair or replace" the eXConnect and eX1 Systems, and (c) breach of its obligation to "provide Equipment Upgrades to the Aircraft no later than September 2017"; (2) breach of the implied covenant of good faith and fair dealing, including by failing to install the Equipment Upgrades in September 2017; and (3) to the extent that any of the Amendments are not valid contracts, promissory estoppel for Panasonic's alleged failure to provide the Equipment Upgrades. *Id.* ¶¶ 44–60.

Panasonic moves to dismiss the complaint.  Dkt. No. 34 (Notice of Motion); Dkt. No. 36 ("Motion").  WCA opposes.  Dkt. No. 39 ("Opp.").  Panasonic has filed a reply.  Dkt. No. 40 ("Reply").

## II.   LEGAL STANDARD

### A.   Motion to Dismiss Under Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." *Id.* 12(b)(6). In a motion to dismiss under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010). However, "[t]he tenet that a court must accept as true a complaint's factual allegations does not apply to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive dismissal under Rule 12(b)(6), a complaint must allege sufficient facts to state a plausible claim. *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). The plaintiff's claim must be more than "speculative." *Twombly*, 550 U.S. at 545. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco*, 622 F.3d at 111. As the Second Circuit recently reaffirmed in *Lynch*, "[i]t is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." 952 F.3d at 79 (citations omitted). A "written instrument" in this context is usually a "legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *Id.* (quoting *Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015)).

A court can also consider documents that are "integral to" the complaint. *Id.* For a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary judgment, the complaint must rely heavily upon its terms and effects. *See DiFolco*, 622 F.3d at 111; *see also* Fed. R. Civ. P. 12(d). "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason . . . was not attached to the complaint." *Glob. Network Comm'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *DiFolco*, 622 F.3d at 111 (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Id.*

### B.     Contract Interpretation

When interpreting a contract, the court's "primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (alteration in original) (quoting *Compagnie*

*Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)).  The language of the contract is given its plain meaning, and the contract is construed "so as to give full meaning and effect to all of its provisions."  *Id.* at 114 (quoting *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

"[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract . . . ."  *Id.* (alterations in original) (quoting *Howard v. Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002)).  A contract is clear and unambiguous "where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."  *Id.* (alteration in original) (quoting *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)).

Conversely, a contract is ambiguous "if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).

## III.   DISCUSSION

Panasonic moves to dismiss portions of the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Specifically, Panasonic argues that WCA has failed to allege a breach of contract claim as to the eX1 System, that the breach of warranty claim as to the eX1 System fails because no warranty covers the eX1 System, that WCA's breach of contract claim

11

as to the Equipment Upgrades is unenforceable, that WCA's implied covenant of good faith and fair dealing claim should be dismissed as duplicative, and that WCA's promissory estoppel claim is also duplicative and fails on the merits.  Motion at 7–9.  Panasonic does not contest the breach of contract claim or breach of warranty claim as to the eXConnect system.

Because this case arises under diversity jurisdiction, the Court applies the substantive law of the forum state, New York, to its analysis.  *See, e.g.*, *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).  The GTA contains a choice-of-law provision:  "This Agreement and performance hereunder[] shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflict of laws principles thereof."  GTA § 14.7.  The parties do not dispute that New York law governs this case.  *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (noting where "the parties' briefs assume that New York substantive law governs the issues," this is "implied consent . . . sufficient to establish the applicable choice of law" (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001))).

In evaluating Panasonic's motion to dismiss, the Court has considered the GTA and the Amendments (together, the "Agreement"), in addition to the factual allegations in the Amended Complaint.  Dkt. Nos. 35-2 to -6.  While the Agreement was not attached to the Amended Complaint, it is clearly integral to WCA's claims, which center around the Agreement and the interpretation and enforcement of its terms.  The parties also rely heavily on the language of the Agreement and do not appear to dispute the authenticity or accuracy of the Agreement.

The Court also adopts, for the purposes of framing the discussion, the parties' division of the Agreement into three substantive portions: (1) the eXConnect System; (2) the eX1 System; and (3) the Equipment Upgrades.  The parties do not discuss, and the Court does not need to decide

today, whether the breach or unenforceability of one portion of the GTA or the Amendments affects the remainder of the Agreement between the parties.[3]

### A.  Breach of Contract Claim as to the eX1 System

WCA asserts a breach of contract claim for Panasonic's alleged "fail[ure] to install the eX1 . . . system[] in a fully working condition and in the manner described in the GTA and related specifications for the eX1 system."  Am. Compl. ¶ 47(a).  Panasonic argues that WCA's breach of contract claim as to the installation of a functional eX1 System is barred by the statute of limitations.

Dismissal of a claim under Rule 12(b)(6) based on an affirmative defense is "warranted only if the [defense]'s applicability [is] shown on the face of the complaint."  *Petersen Energía Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 212 (2d Cir. 2018); *see also Ash v. Jacobsen*, No. [##], 2020 WL 2848178, at *4 (S.D.N.Y. June 1, 2020) (Woods, J.) ("Although the statute of limitations is an affirmative defense, it may be raised by a . . . motion to dismiss under Rule 12(b)(6) . . . if the defense appears on the face of the complaint." (internal quotation marks omitted) (citation omitted)).  Here, it is clear from the face of Plaintiff's complaint—including the documents "integral" to the complaint—that WCA's breach of contract claim as to the eX1 System is time-barred.

The parties dispute which statute of limitations governs WCA's breach of contract claim as to the eX1 System.  Under New York law, the statute of limitations for a breach of contract claim is six years.  N.Y. C.P.L.R. § 213(2).  A breach of contract claim accrues—and the statute of limitations begins to run—at the time of the breach, regardless of when the injured party discovered or should

---

[3] "[W]hether a contract is divisible is a question of intent, determined from the language of the contract and the circumstances under which the contract was made."  *Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.*, 901 F. Supp. 133, 136 (S.D.N.Y. 1995) (citing *Rudman v. Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (1972)).  The Court notes that each of the GTA and the Amendments contain a severability clause.  *See, e.g.*, GTA § 14.8.5; Amendment 1 § 5.4.4.  As for the effect of each Amendment on the preexisting contracts between the parties, the Court notes as a general matter that, "where the contract has been materially modified, the modification establishes a new agreement between the parties which supplants the affected provisions of the underlying agreement while leaving the balance of its provisions unchanged."  *Benipal v. Herath*, 674 N.Y.S.2d 815, 816 (3d Dep't 1998).

have discovered the breach, and even if the resulting damage occurs later.  *See, e.g., V.E.C. Corp. of Del. v. Hilliard*, 896 F. Supp. 2d 253, 260–61 (S.D.N.Y. 2012); *see also Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) ("A cause of action for breach of contract ordinarily accrues and the limitations period begins to run upon breach.  The plaintiff need not be aware of the breach or wrong to start the period running." (citations omitted)).  A breach of contract claim specifically for the sale of goods is subject to a shorter four-year statute of limitations.  N.Y. Uniform Commercial Code ("U.C.C.") § 2-725(1).  Such a claim "accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  *Id.* § 2-725(2).

The Court does not need to determine which statute of limitations governs here because WCA's breach of contract claim as to the eX1 System is time barred regardless of whether the six-year or four-year statute of limitations applies.  WCA alleges that the failures of the eX1 System "dat[ed] from early installation . . . ."  Am. Compl. ¶ 33.  WCA alleges, "[o]n information and belief, these failures occurred in part because Panasonic *failed to install* the eX1 and eX[C]onnect systems pursuant to Panasonic's own specifications . . . ."  *Id.* ¶ 31 (emphasis added); *see also id.* ¶ 47(a) (cause of action asserting breach for "failing to install the eX1 and eXConnect systems in a fully working condition and in the manner described in the GTA and related specifications for the eX1 system").  In short, the alleged breach as to the eX1 System occurred at the time of installation.[4]  Amendment 4 recites, and the parties do not dispute, that the eX1 System was installed on the Aircraft on or about May 19, 2013.  Amendment 4 at 1.  This is also the date by which WCA alleges Panasonic was

---

[4] WCA's argument that there is a factual question of how much "reasonable time" Panasonic had to perform its eX1 system obligations, based on this Court's opinion in *Gillespie v. St. Regis Residence Club*, misses the point.  343 F. Supp. 3d 332 (S.D.N.Y. 2018).  The Court in *Gillespie* held that a party was entitled to a "reasonable time" to perform its contractual obligations *absent a specified time for performance*.  *Id.* at 348.  There is no need to determine a "reasonable time" for Panasonic's time to perform here, where the date of performance (installation of the eX1 system) is both specified in the contract and the parties do not dispute that the installation of the eX1 system occurred on or around that date.  Because the specific date on which WCA's claim accrued is clearly on the face of the Agreement, the Court may resolve this issue on a pre-answer motion to dismiss.  *See, e.g., LiveIntent, Inc. v. Naples*, 293 F. Supp. 3d 433, 442 (S.D.N.Y. 2018) ("Because the relevant dates appear on the face of [the] pleading, the Court may rule as a matter of law on [the] motion to dismiss on statute-of-limitations grounds.").

14

obligated to install a functioning eX1 System.  Amendment 3 § 4.  Panasonic's alleged failure to do so constituted a breach, which started the clock on Panasonic's time to bring a claim based on that breach.[5]  The breach occurred over seven years prior to the filing of this action on September 11, 2020.  *See* Dkt. No. 1.  The time to bring the breach of contract claim based on Panasonic's alleged failure to provide and install a (functional) eX1 System therefore expired under either the four- or six-year statute of limitations.

WCA appears to acknowledge that it cannot recover for any breach of contract claim related to the eX1 System that accrued *before* September 11, 2014.  Opp. at 6 ("[T]he statute of limitations arguably limits *damages* for breaches first occurring prior to six years before the filing of this action . . . .").  Instead, WCA argues that the failure to provide a fully working eX1 System was a *continuous* breach extending beyond the installation date.  *Id.* ("[The statute of limitations] does not bar the *claim* for failure to provide a fully-working eX1 system because the breaches occurred over the course of years after the system was initially installed.").  WCA does not provide any authority for this assertion.

To the extent WCA bases its argument on the "continuing violation doctrine" under New York law, this argument fails.  This doctrine provides that, where "a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew."  *Guilbert*, 480 F.3d at 150 (holding a defendant's continuing obligation to make recurring annual payments defeated the statute of limitations argument).  This doctrine does not cover, however, a single breach that has continuing effects as a result of the breach.  *See, e.g.*, *Phoenix*

---

[5] The claim would accrue on the same day if the Agreement were a sale of goods under the U.C.C.  *See, e.g.*, *Rouse v. Elliot Stevens, Ltd.*, No. 13-cv-01443-SN, 2016 WL 8674688, at *3 (S.D.N.Y. June 24, 2016) ("[A] breach of contract for sale of goods occurs when tender of delivery is made, marking the moment when the seller has fully performed under the contract." (citing *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 410 (1985)); *Richard A. Rosenblatt & Co. v. Davidge Data Sys. Corp.*, 743 N.Y.S.2d 471, 471 (1st Dep't 2002) (holding that claim for breach of contract for provision of securities trading system accrued upon delivery of the goods, despite "incidental" obligation to install and maintain such system).

*Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 577 (S.D.N.Y. 2022) ("Under New York law the continuing breach exception is narrow, [and] restricted to continuing wrongs, not a single wrong that has continuing effects." (quoting *BlackRock Balanced Cap. Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-9367-JMF-SN, 2018 WL 5619957, at *12 (S.D.N.Y. Aug. 7, 2018))), *aff'd sub nom. Phoenix Light SF Ltd. v. Bank of New York Mellon*, 66 F.4th 365 (2d Cir. 2023).

Panasonic's alleged obligation at issue was not a continuing obligation. WCA essentially asserts that Panasonic's single breach, at the time of installing the eX1 System, resulted in continued damages that never abated, not a continuing violation. *See, e.g.*, *Maloul v. New Colombia Res., Inc.*, No. 15-cv-8710-KPF, 2017 WL 2992202, at *6 (S.D.N.Y. July 13, 2017) ("Plaintiffs allege exactly what New York's continuing-wrong doctrine exempts from its coverage: a 'single breach' . . . 'with damages increasing as the breach continue[s].'" (second alteration in original) (quoting *Henry v. Bank of Am.*, 48 N.Y.S.3d 67, 70 (1st Dep't 2017))). By comparison, courts have found continuing obligations in agreements such as those to make annual payments, pay royalties, or maintain a gas supply system. *See Guilbert*, 480 F.3d at 150 (obligation to make annual payments); *Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 422 (S.D.N.Y. 2010) (obligation to pay royalties); *N.Y. Cent. Mut. Fire Ins. Co. v. Glider Oil Co., Inc.*, 936 N.Y.S.2d 815, 820 (1st Dep't 2011) (obligation to supply gas and maintain gas supply system). WCA does not point to any such recurring obligations. And, to the extent that WCA attempts to argue that the statute of limitations does not bar its breach of *warranty* claim, this fails to save the breach of *contract* claim.[6] *See* Opp. at 7 (arguing based on warranty period provided in the Amendments).

Finally, WCA argues that its claim is timely because the GTA and its Amendments comprise one comprehensive contract whose term expired on December 31, 2017, less than three years before

---

[6] WCA's breach of warranty claim is addressed separately later in this opinion.

the commencement of this action.  Amendment 4 § 5 ("Panasonic and [WCA] each agree that the term of the [GTA] shall be extended through December 31, 2017.").  In short, WCA argues that the breach did not occur until the written contractual term for the combined Agreement expired.  The only authority WCA cites in support of this proposition is *Haber v. Gutmann*, in which the purported breach occurred when the defendant, who contracted to renovate the plaintiff's house, abandoned the renovations.  882 N.Y.S.2d 780 (3d Dep't 2009).  But *Haber* makes no reference to any expiration date in the parties' agreement, much less hold that the statute of limitations ran from such date, and the Court is not aware of any case law that provides that WCA's claim accrued upon a specified expiration date of a contract even where breach occurred prior to that date.

Accordingly, WCA's breach of contract claim as to the alleged installation of the eX1 System is barred by the statute of limitations and is dismissed as untimely.[7]

### B.    Breach of Warranty Claim as to the eX1 System

WCA asserts a breach of warranty claim for the alleged breach of "the warranty provisions of the GTA relating to the Products, Software and Services by failing and refusing to repair or replace the combined eX1 and eXConnect system to put it in good working condition and to render the eX1 System free from defects in material and workmanship."  Am. Compl. ¶ 47(b).  Panasonic argues that the eX1 System is not covered by any warranty under the Agreement, express or limited.  Motion at 12–15.  Panasonic is correct, except as to the Services warranty under the Agreement. Any such claim under the Services warranty, however, is time-barred.

As an initial matter, WCA does not dispute that it waived any and all implied warranties that might otherwise apply to the eX1 System.  *See* GTA § 7.3 (warranty disclaimer); *see also Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 750–51 (S.D.N.Y. 2016) ("Under New York law,

---

[7] Because this claim is dismissed as untimely, the Court need not address the parties' arguments as to whether the claim is adequately pleaded.

disclaimers of warranties and representations are permissible, and bar contract claims based on the

alleged breach of those warranties and representations."). The GTA expressly provides for

warranties as to "Products," "Software," and "Services," as follows:

> Panasonic represents and warrants to [WCA] that:
>
> **6.1.1**  The Products shall be free from defects in material and workmanship for a period of thirty-six (36) months from the date of shipment of the Products.
>
> **6.1.2**  For a period of one hundred eighty (180) days from the date of installation, the Software shall substantially operate in accordance with the applicable specification.
>
> **6.1.3**  At the time of delivery to [WCA], the Products shall conform to Panasonic's applicable specifications and the applicable airworthiness authority rules, regulations and specifications which are in effect at such time.
>
> . . .
>
> **6.1.5**  The Services shall be performed in a good and workmanlike manner.

GTA § 6.1. Amendments 1 to 3 contain identical provisions that replace and extend the warranty

periods in Sections 6.1.1 and 6.1.2 of the GTA, which only apply to the Products and Software

warranties. *See* Amendment 1 § 4.2; Amendment 2 § 5.2; Amendment 3 § 5.2.[8] Amendment 4

expands the definition of "Products" to include the New Broadband Controller and the Equipment

Upgrades. Amendment 4 § 6.

---

[8] The warranty extension provision in Amendment 1 is different than those in Amendments 2 and 3. Section 4.2 of Amendment 1 states:

> **4.2.1**  The Products shall be free from defects in material and workmanship for a period commencing on the date of shipment of the Products (the "Shipment Date") and ending on the *earlier to occur* of (a) the date that is sixty (60) months after the Extended Competition Date or (b) the date that ownership of the Aircraft is transferred to an entity that is not controlled by or is under common control with [WCA].
>
> **4.2.2**  The Software shall substantially operate in accordance with the applicable specification for a period commencing on the date of installation (the "Installation Date") and ending on the *earlier to occur* of (a) the date that is one hundred eighty (180) days after the Installation Date or (b) the date that ownership of the Aircraft is transferred to an entity that is not controlled by or is under common control with [WCA].

Amend. No. 1 § 4.2 (emphases added). Notably, Amendments 2 and 3 further extend the warranties by substituting "later to occur" for the italicized "earlier to occur" in the above-quoted provision in Amendment 2. *See* Amendment 2 § 5.2; Amendment 3 § 5.2.

The Court addresses each of these warranties below.

### 1.   The eX1 System Is Not Covered by the "Products" Warranty

The eX1 System is not covered by the "Products" warranty under the Agreement.  Under the GTA, "Products" is defined as "the items set forth in Exhibit A," which in turn lists a single product: "One (1) Shipset eXConnect."  GTA § 1.3 ("Products" definition); *id.* exh. A.  The eX1 System is separately defined in Exhibit F of the GTA, which provides:  "*In addition* to the eXConnect shipset parts . . . , Panasonic is pleased to offer a new cabin management system / in-flight entertainment system . . . ."  *Id.* Exh. F (emphasis added).  In short, "Products" only encompasses the eXConnect System and excludes the eX1 System.  This is supported by the inclusion of the phrase "in addition" in Exhibit F, which indicates that the eX1 System is distinct and separate from the eXConnect System.  The parties was able to, but did not, change the definition of "Products" until Amendment 4, which expands the definition to include "the New Broadband Controller and any Equipment Upgrades . . . ."  Amendment § 6.  The parties therefore included specific *upgrades* to the eX1 System but chose to not fold in the eX1 System itself into the definition of "Products," over the course of five written agreements.  By the plain and clear terms of the Agreement, therefore, the eX1 System is not covered by any "Products" warranty under the Agreement.

WCA argues that the inclusion of the Equipment Upgrades—that is, upgrades to the eX1 System—in the warranty provisions folded in the underlying eX1 System into the warranty provisions as well.  Opp. at 15.  But the text of the Agreement belies WCA's argument:  "*All such upgrades* to the eX1 System shall be covered by the warranty provided in Section 6 of the Agreement . . . ."  Amendment 1 § 4.3 (emphasis added); *see also* Amendment 2 § 5.3; Amendment 3 § 5.3; Amendment 4 § 3.1.  The text is clear on its face that it is the *upgrades* themselves, not the

underlying eX1 System, that are added to the warranty provisions.[9]

### 2. The eX1 System Is Not Covered by the "Software" Warranty

The eX1 System is also not covered by the "Software" warranty under the Agreement. WCA does not argue that the eX1 System was covered by a "Software" warranty. In any case, the GTA defines "Software" as "Panasonic's proprietary operating software in object code format, which is embedded in or downloadable to the Products." GTA § 1.6. The Amendments did not modify this definition. "Software" is plainly and exclusively defined as the software in the "Products"—which, as already discussed, excludes the eX1 System. Therefore, to the extent that the eX1 System's flaws arise out of its software, it is not covered by any "Software" warranty under the Agreement.[10]

### 3. The eX1 System May Be Covered by the "Services" Warranty, But Any Such Claim is Time-Barred

The "Services" warranty of the Agreement arguably encompasses some of the work Panasonic performed to install the eX1 System.[11] The GTA defines "Services" as "certain installation, integration, testing, certification, non-recurring engineering (NRE) and out-of-warranty repair services that Panasonic may perform for [WCA] from time to time pursuant to this Agreement." GTA § 1.4. The GTA then warrants that, "[t]he Services shall be performed in a good

---

[9] WCA's final argument is essentially that Panasonic should be barred from making a breach of warranty claim because Panasonic acted in a way consistent with understanding that the warranty provisions of the Agreement "applied to the eX1 system." Opp. at 16. WCA again cites no authority for this proposition. In any case, this is an argument that turns to extrinsic evidence, which is unnecessary where, as here, the text of the contract is clear. *See, e.g., Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence 'may be considered only if the agreement is ambiguous.'" (citation omitted)).

[10] The Agreement also provides the following disclaimer: "Panasonic does not warrant that the functions contained in the Software will meet [WCA's] requirements or that the operation of the Software will be uninterrupted or error free." GTA § 7.2.

[11] Contrary to Panasonic's assertion that WCA's allegation that Panasonic's alleged failures fell under the Services warranty is newly alleged in its opposition brief, WCA does allege a breach of the Services warranty in its Amended Complaint. *Compare* Reply at 2 & n.2, *with* Am. Compl. ¶ 47(b) ("Panasonic has breached the warranty provisions of the GTA relating to the Products, Software and Services . . . .").

and workmanlike manner." *Id.* § 6.1.5. "Workmanlike" is defined as "worthy of a good workman; 'a competent job' and work will be done in accordance with accepted aviation industry standards." *Id.* § 1.8. The ensuing Amendments did not substitute or amend these provisions. *See, e.g.*, Amendment 1 § 4.2 (amending Sections 6.1.1 and 6.1.2 of the GTA, which only cover the Products and Software warranties). Therefore, the GTA's terms constitute the governing Services warranty for the entirety of the Agreement.

Drawing all relevant inferences in WCA's favor, the installation, integration, testing, and other services for the eX1 System fall under the definition of "Services" under the GTA. The Agreement's provisions regarding the eX1 System focus on its installation, for example. Exhibit F to the GTA contemplates the "installation" of the eX1 System. GTA Exh. F. Amendments 1 to 3 also repeatedly provide for the "installation" of the eX1 System, such as:

> **WHEREAS,** on or about May 25, 2012 Panasonic provided to Buyer a completion schedule (the "Completion Schedule") showing that . . . Panasonic would complete the installation of the eX1 System in the Aircraft on or before September 20, 2012.
>
> . . .
>
> **3. <u>EXTENSION OF COMPLETION DATE</u>.** Panasonic agrees to complete the installation of the eX1 System in the Aircraft by December 20, 2012 (the "Extended Completion Date"), and, subject to the terms of this Amendment, [WCA] agrees to extend the date by which Panasonic is required to complete the installation of the eX1 System in the Aircraft to the Extended Completion Date.

Amendment 1 at 1; *see* Amendment 2 at 1–2 (noting further delay and extension of the completion date for the eX1 System installation); Amendment 3 at 1–2 (same). In addition, the eX1 System is tied to "flight and demonstration testing" requirements and "[a]dditional integration engineering and certification" expectations in the GTA, with "eX1 Installation Engineering," "eX1 Certification," and "eX1 Installation Labor" listed as specific items on the pricing chart provided for the eX1 System. *See* GTA Exh. F. These details indicate that the parties intended for these services related to the eX1 System to be those that Panasonic "may perform for [WCA] from time to time pursuant

to this Agreement," as defined in the Services warranty.  GTA § 1.4.

For WCA's claim to survive, however, it is not enough that Panasonic was obligated to provide services in connection with the eX1 System that were within the scope of the Services warranty under the GTA; WCA must also have adequately pleaded that the warranty was breached—that is, that Panasonic failed to perform a relevant service "in a good and workmanlike manner."  GTA § 6.15.  WCA's breach of warranty claim under the Services warranty is pleaded with little to no detail.  Specifically, WCA alleges in relevant part:

> The . . . eX1 and eXConnect system did not . . . perform according to its specifications or Panasonic's representations. . . .  On information and belief, these failures occurred in part because Panasonic failed to install the eX1 and eX[C]onnect systems pursuant to Panasonic's own specifications, as indicated by the failure of the systems to work as Panasonic itself expected and represented.

Am. Compl. ¶ 31.[12]

The Court need not resolve whether this barebones pleading is sufficient to plead a breach of the Services warranty claim, however, because any such claim is barred by the statute of limitations.[13]  A breach of warranty claim accrues at the date of delivery of the underlying product *or* at the time of breach.  *See, e.g., Ito v. Marvin Lumber & Cedar Co.*, 865 N.Y.S.2d 118, 119 (2d Dep't 2008) ("A cause of action alleging breach of warranty accrues when the breach occurs . . . ."); *Unitron Graphics, Inc. v. Mergenthaler Linotype Co.*, 428 N.Y.S.2d 243, 244 (1st Dep't 1980) (holding breach of warranty claim barred where the claim accrued upon installation of product, which is when "tender of delivery" occurred); *see also Caruloff v. Emerson Radio & Phonograph Corp.*, 445 F.2d 873, 875 (2d Cir.

---

[12] The subsequent warranty repairs that Panasonic performed are outside the scope of the Services warranty, which specifies that "out-of-warranty repairs" are covered, indicating that warranty repairs are excluded.  *See* Am. Compl. ¶ 33 ("Panasonic engaged in warranty repairs . . . on the eXConnect and eX1 systems."); GTA § 1.4 (defining "Services").

[13] WCA argues that Panasonic did not assert a statute of limitations defense on this claim in its Motion.  Opp. at 5 n.2.  While Panasonic appears to have blended the breach of contract claims with the breach of warranty claims in discussing the statute of limitations (as does WCA in its opposition), the Court concludes that Panasonic did assert a statute of limitations defense as to WCA's breach of warranty claim specifically.  *See* Motion at 11, 15.

1971) (finding that breach of warranty claim accrued at sale of underlying product).[14]  While WCA's claim as to the Services warranty is barebones, it is at least clear that the only "service" at issue is the installation of the eX1 System.  *Id.* ¶ 31 ("[T]hese failures occurred in part because Panasonic *failed to install* the eX1 and eX[C]onnect systems pursuant to Panasonic's own specifications . . . ." (emphasis added)).  The breach of warranty claim therefore also begins to run, at the latest, from the date of the eX1 System installation, which occurred on or about May 19, 2013, more than seven years prior to the commencement of this suit.  Amendment 4 at 1.  Therefore, whether the four-year statute of limitations under the N.Y. U.C.C. or a longer six-year statute of limitations applies,[15] WCA's breach of warranty claim under the Services warranty is time-barred.

WCA appears to argue that a breach of warranty claim accrues upon the expiration of a warranty period.  *See* Opp. at 7.  WCA cites no support for this argument, and the Court is not aware of any.  Importantly, the only warranty at issue is that certain services, at the time that they are performed, will be performed in a specified manner—there is no "expiration" period to consider, as one might with a warranty to keep a certain product free from defects for a specified period of time.

Accordingly, WCA's breach of warranty claim as to the eX1 System is dismissed.

---

[14] WCA argues that its breach of warranty claim is not time-barred because the U.C.C. provides that the claim accrues "when the breach is or should have been discovered" *if* "a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance."  N.Y. U.C.C. § 2-725(2).  This fails for numerous reasons, including that WCA does not point to any *explicit* extension of the Services warranty to a future performance.  Nor could any such warranty of future performance be shown for the Services warranty, which promises that a service, at the time that it is performed, will be done in a specific manner.  *Cf. Coakley v. Regal Cinemas, Inc.*, 134 N.Y.S.3d 74, 79 (2d Dep't 2020) ("A warranty of future performance is one that guarantees that the product will work for a specified period of time."); *Woods v. Maytag Co.*, No. 10-cv-0559 (ADS) (WDW), 2010 WL 4314313, at *4 (E.D.N.Y. Nov. 2, 2010) (finding no guarantee of future performance in one-year repair or replacement warranty).  In any case, the performance at issue (installation) has already occurred and has been—or should have been—discovered.

[15] *Compare Unitron Graphics, Inc. v. Mergenthaler Linotype Co.*, 428 N.Y.S.2d 243, 244 (1st Dep't 1980) (holding breach of warranty claim was barred under U.C.C.'s four-year statute of limitations), *with Complaint of Am. Export Lines, Inc.*, 620 F. Supp. 490, 515 (S.D.N.Y. 1985) (finding breach of warranty for workmanlike services was subject to the six-year statute of limitations that governs a contract for services).

### C.        Breach of Contract: The Equipment Upgrades

Panasonic seeks to dismiss WCA's breach of contract claim as to the alleged failure to

provide the Equipment Upgrades[16] by arguing that, due to a lack of mutuality of obligation or

definiteness in the Agreement, the parties' bargain as to the Equipment Upgrades is an

unenforceable agreement.  Motion at 15–20.  Because the Equipment Upgrades are supported by

consideration and are not too ambiguous to be unenforceable, Panasonic's arguments fail.

Over the course of four Amendments, the Agreement defines the Equipment Upgrades as

follows:

> Panasonic shall install in the Aircraft in September 2017 (or such other month as the
> parties may agree) any and all upgrades to the eX1 System then available, including
> touch screens, Blu-ray players, audio speakers, LCD cabin monitors, cabin handsets,
> system remote controls and related software.

Amendment 1 § 4.3; Amendment 2 § 5.3; Amendment 3 § 5.3; Amendment 4 § 3.1.  In relevant part,

Amendments 1 to 3 then provide as follows:

> It is the intention of [WCA] and Panasonic that the costs of all such upgrades shall
> be exchanged for Demonstration Flights as described below.
>
> . . .
>
>  In the event that [WCA] agrees to provide Aircraft demonstration flights . . . .
>
> . . .
>
> Panasonic acknowledges and agrees that nothing in this Amendment obligates
> [WCA] to provide Aircraft demonstration flights for Panasonic or its prospective
> customers and that the provision of such flights shall be solely at [WCA's] discretion.

Amendment 1 §§ 4.3, 4.4; Amendment 2 §§ 5.3, 5.4; Amendment 3 §§ 5.3, 5.4.  Amendment 4

provides: "It is the intention of [WCA] and Panasonic that the costs of all such upgrades shall be

---

[16] The Amended Complaint does not allege a breach of warranty claim as to the Equipment Upgrades.  *See* Am. Compl.
¶ 47.

exchanged for Demonstration Flights as described in Amendment 3, Section 5.4." Amendment 4
§ 3.2.

### 1.    *Mutuality of Obligation*

"To form a valid contract under New York law, there must be an offer, acceptance,
consideration, mutual assent, and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393,
427 (2d Cir. 2004). An "illusory" contract, or "[a]n agreement in which one party gives as
consideration a promise that is so insubstantial as to impose no obligation," is unenforceable. *Lend
Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684 (2017) (alteration in original).
"Unless both parties to a contract are bound, so that either can sue the other for a breach, neither is
bound." *Reddy v. Mihos*, 76 N.Y.S.3d 13, 17 (1st Dep't 2018) (quoting *Oscar Schlegel Mfg. Co. v. Peter
Cooper's Glue Factory*, 231 N.Y. 459, 462 (1921)) (finding agreement unenforceable where plaintiff
failed to make a binding promise), *appeal denied*, 32 N.Y.3d 902 (mem.). While sometimes referred to
as a "mutuality" requirement, the relevant inquiry is simply one of consideration: whether
"something is promised, done, forborne or suffered by [a party] . . . as consideration for the promise
made to him." *Dan-Bunkering (Am.), Inc. v. Tecnologias Relacionadas con Energia y Servicios Especializa*, No.
17-cv-9873-KPF, 2020 WL 3893281, at *7 (S.D.N.Y. July 10, 2020) (quoting *Weiner v. McGraw-Hill,
Inc.*, 57 N.Y.2d 458, 464 (1982)); *accord Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228,
255 (S.D.N.Y. 1999) (citing *Weiner*, 57 N.Y.2d at 464) ("It is consideration that is required to form a
contract under New York law, not rigorous reciprocity or mutuality."). Even a lack of consideration
can be remedied by the subsequent conduct of the parties. *See, e.g.*, *Faust Harrison Pianos Corp. v.
Allegro Pianos, LLC*, No. 09 Civ. 6707(ER), 2013 WL 2292050, at *11 (S.D.N.Y. May 24, 2013)
(quoting *Ferguson v. Ferguson*, 470 N.Y.S.2d 715, 716 (3d Dep't 1983)). Finally, "an interpretation that
renders a contract illusory and therefore unenforceable is disfavored and enforcement of a bargain is
preferred, particularly where . . . the parties have expressed their intent to be contractually bound in

a writing." *Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*, 915 N.Y.S.2d 531, 535 (1st Dep't 2011) (citations omitted); *accord Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016) (quoting *Credit Suisse First Bos.*, 915 N.Y.S.2d at 535), *aff'd*, 712 F. App'x 57 (2d Cir. 2017).

   Panasonic argues that the only consideration that WCA offered in exchange for Equipment Upgrades were certain demonstration flights, which WCA was free to provide or not provide at its discretion. Motion at 16. But the words that Panasonic points to in support of this argument do not operate in a vacuum. Panasonic does not deny that the parties have "expressed their intent to be contractually bound in a writing," as is evident from the five separate, written agreements between the parties. *See Credit Suisse First Boston*, 915 N.Y.S.2d at 535. Panasonic zeroes in on a specific "bargain"—that of the Equipment Upgrades—in this relatively complex set of contracts and seeks to divorce it from the rest of the parties' agreement. This ignores the myriad of promises and consideration exchanged between the parties. For example, the Equipment Upgrades were first introduced in the parties' Agreement in Amendment 1 with these words: "In consideration of the agreement of [WCA] to extend the date by which Panasonic is required to complete the installation of the eX1 System . . . ." Amendment 1 §§ 5, 5.3; *see also* Am. Compl. ¶ 26. In other words, the Equipment Upgrades were offered, at least in part, as consideration for the extension of Panasonic's deadline to install the eX1 System. Panasonic made full use of the extension, completing the installation of the eX1 System on or around May 19, 2013, almost three years after the original date of delivery of the Shipset bargained for in the GTA. *See* GTA § 2.2; Amendment 4 at 1. This exchange of consideration alone shows that the Equipment Upgrades bargain is not illusory.

   There are numerous other indications that the Equipment Upgrades was not an illusory promise. For example, the very fact that the parties entered into a final written contract following the installation of the eX1 System—Amendment 4—that specifically in part focuses on the Equipment Upgrades indicates that the parties intended to be bound in good faith in contract to the

provision of the Equipment Upgrades.  *See, e.g., Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) ("Under New York law, a covenant of good faith and fair dealing is implied in all contracts.").  This, coupled with the allegation that WCA did in fact provide demonstration flights to Panasonic as part of its compliance with the Agreement, Am. Compl. ¶ 2, indicates that WCA had at least an obligation to provide *some* demonstration flights, though perhaps with considerable leeway in how and when they were provided.  *See, e.g., Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) ("Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."); *Lebowitz v. Dow Jones & Co.*, 508 F. App'x 83, 84 (2d Cir. Jan. 28, 2013) ("Under New York law, a contract is not illusory merely because its terms give discretion to one party to the contract, as every contract encompasses the implied duty of good faith and fair dealing." (citations omitted)).  And, while Amendment 4 may not be the picture of clear drafting, the parties do not dispute that WCA was at the very least required to provide "Flight Tests" as part of its terms and, at this stage of the litigation, Panasonic has failed to show that its promise to provide the Equipment Upgrades were not at least in part based on that promised consideration.  *See, e.g., Granite Partners*, 58 F. Supp. 2d at 252–56 (declining to dismiss for lack of consideration where letters, purporting to modify the terms of the parties' contractual relationship, were "not drafted in the clearest terms possible" but presented a number of potential ways in which they were not invalid for want of consideration).[17]

### 2.   *Indefiniteness*

"Few principles are better settled in the law of contracts than the requirement of definiteness[:]  If an agreement is not reasonably certain in its material terms, there can be no legally

---

[17] Panasonic's cited cases are not to the contrary.  For example, *CARI, LLC v. 415 Greenwich Fee Owner, LLC*, dealt with a party's unilateral right to terminate the contract in question entirely, which is not at issue here.  939 N.Y.S.2d 319, 320 (1st Dep't 2012) ("The contracts' termination provision provided that plaintiff could cancel the agreement for any reason . . . .  The court correctly determined that the termination provision rendered the contract unenforceable for lack of mutual consideration."), *aff'd*, 19 N.Y.3d 845 (2012).

enforceable contract." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989); *accord Arbitron, Inc. v. Tralyn Broad., Inc.*, 400 F.3d 130, 134–37 (2d Cir. 2005) (analyzing *Cobble Hill* and other New York Court of Appeals cases on indefiniteness in contracts).  The purpose of the definiteness requirement is twofold:  "*First*, unless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy. . . . *Second*, the requirement assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement."  *Cobble Hill Nursing Home, Inc.*, 74 N.Y.2d at 482 (emphasis in original).

Precatory language, such as language that purports to name the "intention of the parties" or "the goal" of a contract, is not generally enforceable.  *See, e.g.*, *Adv. Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 320 (S.D.N.Y. 2020) (quoting *Dragon Head LLC v. Elkman*, 987 N.Y.S.2d 60, 61(1st Dep't 2014)).  Similarly, an "agreement to agree, in which a material term is left for future negotiations, is unenforceable."  *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109– 11 (1981) (finding agreement to renew lease at a rental "to be agreed upon" was unenforceable).  At the same time, "all the terms contemplated by [an] agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy."  *Kolchins v. Evolution Mkts, Inc.*, 8 N.Y.S.3d 1, 10 (1st Dep't 2015).  "[W]here it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain."  *In re 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991).  In short, the definiteness requirement should not be applied rigidly, and a court simply looks to whether "it is able to determine what in fact the parties have agreed to." *Id.*  "Striking down a contract as indefinite and in essence meaningless is at best a last resort."  *Id.* (citation omitted).

Panasonic argues that the Equipment Upgrades bargain is too indefinite to be enforced because the Agreement does not (1) precisely define the Equipment Upgrades or (2) provide for a specific quantity of the demonstration flights or other price in exchange for the Equipment Upgrades.  Motion at 17–20.  "Contracting parties are often imprecise in their use of language," and imprecision alone is not reason to find an agreement unenforceable.  *In re 166 Mamaroneck Ave. Corp.*, 78 N.Y.2d at 91.  Panasonic fails to identify an ambiguity sufficient to render the Equipment Upgrades bargain "meaningless."  *Id.*

First, Panasonic asks the Court to conclude that, because the parties were not able to predict the precise nature of the upgrades to the eX1 System that would be available in the future, as of September 2017, the entire Equipment Upgrades bargain is unenforceable.  This is illogical.  While the Agreement does not specify each detail of the Equipment Upgrades to be provided in September 2017, it does provide—over the course of five separate, written agreements that Panasonic agreed to—a temporal limit (upgrades "then available" in September 2017, unless otherwise agreed upon by the parties) and a non-exhaustive but exemplary list of aspects of the eX1 System that the upgrades might affect ("touch screens, Blu-ray players, audio speakers, LCD cabin monitors, cabin handsets, system remote controls and related software").  *See, e.g.*, Amendment 1 § 4.3; Amendment 4 § 3.1.  As added context, the Equipment Upgrades bargain entered the parties' Agreement as the date of installation for the eX1 System was continually extended, with the eX1 System finally being installed on or about May 19, 2013.  *See* Amendment 4 at 1; Am. Compl. ¶¶ 26– 28.  These details provide sufficient parameters to show that Panasonic contracted to provide WCA with whatever model or version of the eX1 System was available as of September 2017, to the extent that Panasonic continued to develop and improve upon its eX1 System product and software[18] after

---

[18] Specifically, to the "touch screens, Blu-ray players, audio speakers, LCD cabin monitors, cabin handsets, system remote controls and related software" of the eX1 System.  *See* Amendment 4 § 3.1.

the parties first entered into a contract in 2010.  *See* GTA at 15 (dates of contract).  What that specific model or version constitutes is a question of fact to be resolved later; at this stage, it is enough that Panasonic was bound by an enforceable obligation.

Second, as already discussed, WCA was obligated to provide *some* demonstration flights, and it is immaterial that no defined number of such flights was provided; and even if the Agreement imposes no such duty on WCA, Panasonic's promise to provide the Equipment Upgrades is nonetheless enforceable, given that there was other consideration—such as the extension of the completion date for the eX1 System installation—for such promise.

Accordingly, Panasonic has failed to show that the Equipment Upgrades bargain is unenforceable.

### D.    Breach of the Implied Covenant of Good Faith and Fair Dealing

WCA asserts a breach of the implied covenant of good faith and fair dealing arising out of the parties' Agreement.  Am. Compl. ¶¶ 49–55.  WCA's claim fails because WCA fails to plead an implied covenant claim separate and distinct from its breach of contract claim.

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."  *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (citation omitted).  As a result, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Id.* at 81 (affirming dismissal of implied covenant of good faith and fair dealing claim as duplicative of breach of contract claim).

The implied covenant of good faith and fair dealing is "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (citation omitted).  In

short, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise

not to act arbitrarily or irrationally in exercising that discretion." *Id.* (citation omitted).  The implied

covenant does not include any obligation inconsistent with the express terms of the contract,

however, and it "does not extend so far as to undermine a party's general right to act on its own

interests in a way that may incidentally lessen the other party's anticipated fruits from the contract."

*Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016), *aff'd*, 712 F. App'x 57

(2d Cir. 2017); *see also Border v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–99 (2d Cir. 2005) (noting the

implied covenant only imposes an obligation consistent with the contract's terms and does not add

to it).

Therefore, to plead both a breach of contract claim and an implied covenant claim, a

plaintiff must thread the needle of "alleg[ing] an implied duty that is consistent with the express

contractual terms, but base[d] . . . on allegations that are distinct from the factual predicate for its

contract claims." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08-cv-9116, 2009 WL 321222,

at *5 (S.D.N.Y. Feb. 9, 2009) (citation omitted).  Otherwise, "raising both claims in a single

complaint is redundant, and courts confronted with such complaints under New York law regularly

dismiss any freestanding claim for breach of the covenant of fair dealing." *Id.* (citation omitted); *see

also Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 369 (S.D.N.Y. 2016) (Woods, J.)

("Any freestanding claim for a breach of the covenant of good faith and fair dealing, based on the

same allegations, are redundant and must also be dismissed."); *Netologic, Inc. v. Goldman Sachs Grp.,

Inc.*, 972 N.Y.S.2d 33, 34–35 (1st Dep't 2013) (affirming dismissal of implied covenant claim where

both claims "arise from the same facts and seek the identical damages" (citation omitted)).[19]

---

[19] A dismissal of the implied covenant claim as duplicative is appropriate regardless of whether the breach of contract claim survives.  *See, e.g.*, *Gray v. Toyota Motor Sales, U.S.A., Inc.*, 806 F. Supp. 2d 619, 624 (E.D.N.Y. 2011) (holding dismissal of implied covenant claim was appropriate where contract claim was separately dismissed); *see also Harris*, 310 F.3d at 80–81 (affirming dismissal of implied covenant claim as duplicative despite reversing dismissal of contract claim).

WCA's implied covenant of good faith and fair dealing claim is not "based on allegations different from those underlying the accompanying breach of contract claim." *JPMorgan Chase Bank*, 2009 WL 321222, at *5 (citation omitted).  WCA alleges that Panasonic failed to provide working eX1 and eXConnect systems with any and all upgrades to the system available as of September 2017." Am. Compl. ¶ 53.  This is identical in substance to WCA's breach of contract claims.  *Id.* ¶ 47.  Nor does WCA does allege that Panasonic engaged in any arbitrary or irrational action to deny WCA of "the fruits of the contract."  *See Fishoff*, 634 F.3d at 653 (finding breach of the implied covenant where defendant arbitrarily cut value of shares only as to plaintiff and only after plaintiff tried to exercise his purchase option of defendant's shares).

At most, WCA arguably asserts that Panasonic had an implied duty to make good faith efforts to identify and install the Equipment Upgrades, as available, in September 2017, and that Panasonic breached that duty by "assert[ing] that the [Equipment Upgrades] were too uncertain to allow it to perform and . . . not making an effort to install then-available upgrades in 2017." *Id.* ¶ 54. This nonetheless amounts to a claim that Panasonic was obligated, but failed, "to provide the Equipment Upgrades to the Aircraft no later than September 2017." *Id.* ¶ 47(c) (breach of contract claim as to the Equipment Upgrades).  There is no separate and distinct claim for breach or damages other than from Panasonic's alleged failure to provide the Equipment Upgrades on a timely basis. *See, e.g.*, *Rojas v. Don King Prods., Inc.*, No. 11-cv-8468, 2012 WL 760336, at *4 (S.D.N.Y. Mar. 6, 2012) (finding implied covenant claim duplicative despite slight differences in alleged breaches, where "[t]he damage asserted is . . . intrinsically tied to the damage resulting from the breach of contract").

Accordingly, WCA's implied covenant of good faith and fair dealing claim is dismissed.

### E.      Promissory Estoppel

WCA brings a claim of promissory estoppel as to Panasonic's alleged failure to provide the Equipment Upgrades.  Am. Compl. ¶ 58.  WCA concedes that this claim is asserted in the

alternative, to the extent that the Court finds that there was no valid and enforceable contract between the parties.  Opp. at 18.  Panasonic has failed to show that the Agreement is unenforceable—but, in any case, WCA has failed to allege a promissory estoppel claim even in the alternative.  Therefore, WCA's promissory estoppel claim is dismissed.

Promissory estoppel requires:  "(1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance." *MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*, 929 N.Y.S.2d 571, 577 (1st Dep't 2011). "[P]romissory estoppel . . . is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason."  *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 361 (S.D.N.Y. 2017); *accord BNP Paribas Mortg. Corp v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 516 (S.D.N.Y. 2013) ("[P]romissory estoppel is a narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement . . . .").  Therefore, "[t]he existence of a valid and enforceable contract governing a particular subject matter precludes recovery under a promissory estoppel cause of action arising out of the same subject matter." *Bennett v. State Farm Fire & Cas. Co.*, 181 A.D.3d 777, 778 (2d Dep't 2020) (finding existence of homeowner's insurance policy barred promissory estoppel claim); *accord O'Grady v. BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 504 (S.D.N.Y. 2015) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987)) (dismissing promissory estoppel claim based on this "well settled" principle), *aff'd*, 636 F. App'x 2 (2d Cir. Apr. 14, 2016).

"Courts dismiss promissory estoppel claims as duplicative 'unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract.'"  *Hallet v. Stuart Dean Co.*, 481 F. Supp. 3d 294, 307 (S.D.N.Y. 2020) (quoting *Underdog Trucking, LLC v. Verizon Servs. Corp.*, No. 09-cv-8918, 2010 WL 2900048, at *6 (S.D.N.Y. July 20, 2010)); *see, e.g., Nungesser v. Columbia*

*Univ.*, 169 F. Supp. 3d 353, 374 (S.D.N.Y. 2016) (Woods, J.) (dismissing promissory estoppel claim as "redundant"); *Kim v. Francis*, 125 N.Y.S.3d 411, 412 (1st Dep't 2020) (dismissing the promissory estoppel claim as duplicative even though it was adequately pleaded).  However, "a party is not precluded from proceeding on both breach of contract and quasi-contract theories where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue." *Dart Brokerage Corp. v. Am. Comm. Ins. Co.*, No. 13-cv-04015, 2013 WL 5966901, at *2 (S.D.N.Y. Nov. 7, 2013) (alteration in original) (citation omitted).

WCA's promissory estoppel claim only focuses on the Equipment Upgrades bargain.  *See* Am. Compl. ¶ 58 ("Panasonic's promises . . . constitute clear and unambiguous promises to WCA to provide upgrades to the eX1 system in the form of upgrades that were available from Panasonic in the year 2017.").  The Court has rejected Panasonic's argument that the Equipment Upgrades bargain is enforceable; therefore, WCA's promissory estoppel claim is precluded because there is no *bona fide* dispute as to the existence of an enforceable written contract that covers the dispute at issue.  *See Dart Brokerage Corp.*, 2013 WL 5966901, at *2.

In any case, although the Court has rejected Panasonic's argument that its obligation to provide the Equipment Upgrades is not *so* indefinite to render it unenforceable, the Equipment Upgrades bargain also cannot be said to be defined in such a "sufficiently clear and unambiguous" manner that WCA was entitled to "reasonably rely" upon them.  *See, e.g., Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) (holding defendant's alleged promise was "so vague and indefinite that reliance upon that promise . . . cannot be said to be reasonable"), *aff'd*, 652 F.3d 333 (2d Cir. 2011); *Richbell Info. Servs. v. Jupiter Partners*, 765 N.Y.S.2d 575 (1st Dep't 2003) (finding alleged promise to be "too indefinite to be the type of clear and unambiguous promise required for promissory estoppel").  WCA does not, for example, point to any specific upgrade— such as a specific improved or new function of the "touch screens" or "Blu-ray players" on the eX1

System installed on the Aircraft, *see* Amendment 4 § 3.1—that it could expect, much less trust that would be provided by September 2017.

Accordingly, WCA's claim for promissory estoppel is dismissed.

## IV.    LEAVE TO AMEND

"It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)); see *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 62 (2d Cir. 2016) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend.").

WCA's breach of contract claim as to the eX1 System and promissory estoppel claim are dismissed with prejudice and without leave to amend. The Court's dismissal as to these claims is based on the text of the Agreement between the parties and facts, such as the date of the installation of the eX1 System, that are undisputed and fixed. Re-pleading these claims would be futile. Given the liberal standards of Federal Rule of Civil Procedure 15(a)(2), the Court will grant WCA leave to amend its breach of warranty claim as to the eX1 System and its breach of the implied covenant of good faith and fair dealing claim, but only to cure the deficiencies identified in this opinion.

## V.    CONCLUSION

For the reasons stated above, Panasonic's Motion to Dismiss is GRANTED IN PART AND DENIED IN PART. Dkt. No. 34. The following claims are dismissed:

(1)    breach of contract as to the eX1 System, with prejudice;

(2)    breach of warranty as to the eX1 System, without prejudice;

(3)      breach of the implied covenant of good faith and fair dealing, without prejudice; and

(4)      promissory estoppel, with prejudice.

For the avoidance of doubt, WCA's breach of contract claim as to the Equipment Upgrades survives Rule 12(b)(6) dismissal. The Motion also does not address, and therefore leaves intact, WCA's breach of contract and breach of warranty claims as to the eXConnect system.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 34.

SO ORDERED.

Dated: December 5, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge