October 17, 2024

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/19/24
```

**VIA ECF**

Honorable Gregory H. Woods
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

**MEMORANDUM ENDORSED**

Re: *WCA Holdings III, LLC v. Panasonic Avionics Corporation*
Case No. 1:20-cv-07472-GHW – Meet and Confer Joint Letter

Dear Judge Woods:

We write pursuant to the Court's Order dated October 10, 2024, directing the parties to meet and confer and submit a joint letter reflecting the conference once completed. *See* Dkt. No. 169.

Plaintiff WCA Holdings III, LLC's ("WCA") continues to pursue the discovery motions described in its October 7 letters. The scope of that requested discovery has not changed.

The parties met and conferred on October 14, 2024. The parties agreed on the call that they had met their discovery conference obligations, and confirmed the same in writing following the meeting.

**WCA's Position**.

WCA filed two letters on October 7, 2024 seeking relief from the Court related to outstanding discovery. The first sought documents described by a representative of Panasonic Avionics Corporation ("PAC"), Mr. Richard Kennedy, in his deposition. First, Mr. Kennedy described certain parts that could have theoretically been installed on WCA's aircraft and the location of prices for comparable parts. Ex. A (Excerpts of Richard Kennedy Deposition of 9-27-24 at 306:2-7; 307:12-19) (describing list of "aspirational" Panasonic parts); *id.* (367:10-14, 18-20, 367:21-368:3, 12-14, 16-23) (testifying that prices for comparable parts to the "aspirational" Panasonic parts could be found in a contract between Panasonic and Lufthansa Technik). Mr. Kennedy also testified that there were likely other iterations of a marketing document, introduced as Kennedy Exhibit 23 at his deposition. *See id.* at 374:22-375:10; 376:9-11; 377:12-21.

Counsel for PAC has represented that PAC personnel have been unable to locate either the document showing prices for IDAIR components that Mr. Kennedy mentioned or iterations of Exhibit 23 from Mr. Kennedy's deposition. PAC has stopped short of saying such documents did not exist; PAC has been unable to locate such documents in the three weeks since Mr. Kennedy's deposition. WCA believes these documents may prove critical to its damages calculations and

presentation at trial, and, therefore, unless and until PAC can confirm that the documents do not exist, WCA continues to seek an order compelling production.

The second letter WCA filed on October 7, 2024 dealt with PAC's privilege log. WCA continues to believe that PAC is improperly or incorrectly asserting privilege as to (i) email attachments, and (ii) documents between non-lawyers identified vaguely as potentially seeking future legal advice. WCA has directed PAC to its letter, which identifies each specific log entry WCA identified as insufficient. WCA is unable to provide further analysis or identification of documents that it has not seen.

WCA's position is based on (1) the documents it has seen and (2) the statements made by counsel for PAC. As to the documents WCA has reviewed, for example, a document was used as an exhibit at Mr. Kennedy's deposition, which PAC clawed back in the middle of the proceedings. Again, counsel for WCA has fully reviewed that document; there is no basis for privilege because (i) no legal advice was sought or received, and (ii) no lawyer was included on the email. Despite the October 14 discovery conference, PAC continues to disagree.

As to the statements from counsel for PAC, they have represented both by phone and in writing that all remaining documents attached to an email sent to an attorney are privileged. Not so. PAC has provided no case law to support a situation in which a non-lawyer sends non-privileged documents to an attorney and it *per se* cloaks such attachments in privilege, even where the document is otherwise non-privileged and responsive to WCA's document requests.[1] PAC's counsel also confirmed that these attachments have not otherwise been produced to WCA from some other source. Counsel for PAC has also stated that a non-attorney who works with lawyers in the contract department establishes privilege in an email communication. Again, this is not a universally applicable rule. WCA agrees that in some cases, such as those in which non-attorneys relay advice provided by counsel, privilege may apply narrowly to the content of that relayed advice. It is not the case, however, that copying a non-attorney who sometimes works with lawyers in an email communication makes the entire communication subject to the attorney-client privilege. Again, the parties were unable to resolve this issue in the October 14 discovery conference.

**PAC's Position**

**WCA's Privilege Challenges.** During the parties' 24-minute discovery conference, on October 15, 2024, WCA refused to identify the specific logged documents with which it takes issues. Instead, WCA challenged the categories of privileged documents and continued to claim that PAC's privilege assertions are deficient. As previously noted, PAC has in good faith reviewed the challenged documents on more than one occasion, recently released documents (despite a legitimate privilege claim) that could be released from the log, and provided WCA with a third supplemental and revised log on October 4, 2024 (the "10/4 Log"). *See* Dkt. No. 167 at 3 (citing Ex. M). The 10/4 Log contained updated and revised privilege descriptions and PAC produced

---

[1] Were that to be the law, which it is not, one could see many employees abusing such a rule to prevent the disclosure of key documents in a lawsuit.

the released documents to WCA on the same day. *See id*. WCA's most recent submission here, makes clear that while it agrees with the privilege grounds asserted by PAC, WCA simply does not trust that PAC has properly withheld its documents. That is not a basis for *in camera* review and WCA's request should be denied.

As explained in the prior joint submission (Dkt. No. 167), WCA admits that email attachments of confidential drafts from in-house attorneys provided in connection with legal advice are privileged. *See, e.g.*, Log Nos. 82–89, 92–93, 118, 120, 130–31, 135–36, 181–84, 185-A–C, and 186-A–D. For the first time during the meet and confer, WCA asked whether the foregoing withheld email attachments had been produced. PAC offered to check but that was not good enough. PAC can confirm that the following email attachments have previously been produced to WCA: Log Nos. 82–89, 181–84, 185-A–C, and 186-A–D. *See, e.g.*, PAC0036398–PAC0036407, PAC0023054–PAC0023061, PAC0023070–PAC0023077. Regardless, each of the challenged email attachments is properly withheld as privileged. *See* Dkt. No. 167 (citing *In re County of Erie*, 473 F.3d 413 (2d Cir. 2007); *Carter v. Cornell Univ.*, 173 F.R.D. 92, 95 (S.D.N.Y. 1997) and *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183–84 (2d Cir. 2007)). For example, Log Nos. 130–36 include an attorney draft and additional privileged emails with in-house counsel at a time when PAC reasonably anticipated litigation. Requiring PAC to provide further detail would render the privilege log meaningless.

As for communications between non-attorneys, WCA's principal complaint relates to Log No. 23,[2] which is an email with PAC's associate general counsel and his staff within the legal contracts department, that was clawed back on June 13, 2024. In addition, WCA challenges Log No. 202, which is another email with PAC's legal contracts department that was clawed back during the deposition of one of PAC's Rule 30(b)(6) witnesses. As discussed (Dkt. No. 167 at 5), privilege attaches to communications with non-attorneys working at the direction of counsel (*e.g.*, paralegals, secretaries, clerks) such as staff in PAC's Contracts Department, many of whom are attorneys. *See* Dkt. No. 167 (citing cases). One such person is Michael Fettig, Esq. (Sr. Contracts Manager, Legal Department). Log No. 23 (email subject "WCA xTV"), contains minimal redactions regarding information provided to Mr. Fettig for purposes of obtaining legal analysis. Later on in the email chain (PAC0014648–49), Keith Matulich, Esq. (Director of Contracts, Legal Department) is added and legal advice is sought regarding the WCA relationship. Log No. 202 which subject contains "WCA Concerns on Contract" involves communications with Roger Erickson (Sr. Director Contracts, Legal Department), who although not an attorney, reported directly to, and at the direction of, Mr. Matulich and Susan Hall (VP Legal Affairs). This document (like Log No. 23) is also minimally redacted where the communications were made to facilitate the rendering of legal services by PAC's legal contracts department.

Lastly, WCA's contention that PAC has refused to supplement its privilege log is wrong. *See* Dkt. No. 167 at 3. PAC has *repeatedly* offered to review its logged communications, but WCA has refused to specify the log numbers. While PAC believes its privilege descriptions are

---

[2] WCA challenges Log Nos. 186–201 (iterations of the email chain in Log No. 23) for the same reasons it challenges Log No. 23.

3

sufficient, PAC is willing to provide additional detail to the extent the Court deems doing so necessary and so as not to burden the Court with *in camera* review.

**WCA's Belated Discovery Requests.** WCA seeks (1) documents showing pricing for "aspirational" LHT/IDAIR parts and (2) iterations of Kennedy Deposition Exhibit 23, the "eX1 Products and Services Description" document. During the meet and confer, PAC confirmed that based on its searched to date, PAC was unable to locate the requested documents. Therefore, PAC cannot confirm that such documents exist given that it has been unable to locate these documents. WCA's request should be denied because the requested documents do not exist based upon PAC's reasonable search to date. *See*, *e.g.*, *Agerbrink v. Model Serv. LLC*, No. 14CIV7841JPOJCF, 2017 WL 933095, at *5 (S.D.N.Y. Mar. 8, 2017) (explaining "[t]he standard for evaluating discovery is reasonableness, not perfection[]" and denying portion of motion to compel given defendants' reasonable search).

Regardless, WCA's request to file a motion to compel such documents should be denied based on WCA's unreasonable delay in seeking such documents a mere *four* days before the fact discovery deadline. *See Sportvision, Inc. v. MLB Advanced Media, L.P.*, 18-CV-03025 (PGG) (VF), 2022 WL 2817141, at *5 (S.D.N.Y. July 19, 2022) (denying discovery request raised by plaintiff "nearly two weeks before the then-close of fact discovery[.]").

Respectfully,

/s/ Christopher M. Wyant
Christopher M. Wyant
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Counsel for Plaintiff WCA Holdings III, LLC

The Court will hold a status conference with respect to this matter by telephone on October 24, 2024 at 3:00 p.m. The parties are directed to the Court's Individual Rules of Practice in Civil Cases, which are available on the Court's website. Rule 2 of the Court's Individual Rules contains the dial-in number for the conference and other relevant instructions. The parties are specifically directed to comply with Rule 2(C) of the Court's Individual Rules.

/s/ Wanda French-Brown
Wanda French-Brown
FOX ROTHSCHILD LLP
101 Park Avenue, 17th
New York, NY 10178
Counsel for Defendant Panasonic Avionics Corp.

SO ORDERED.

Dated:  October 19, 2024
New York, New York

GREGORY H. WOODS
United States District Judge

4

# EXHIBIT A

CONFIDENTIAL

```
1              UNITED STATES DISTRICT COURT
2         FOR THE SOUTHERN DISTRICT OF NEW YORK
3
4   WCA HOLDINGS III, LLC,        ) NO. 1:20-cv-7472
                                  )
5              Plaintiff,         )
                                  )
6        v.                       )
                                  )
7   PANASONIC AVIONICS CORPORATION,)
                                  )
8              Defendant.         )
    _____)
9
10
11
12              CONFIDENTIAL TRANSCRIPT
13                    VOLUME II
14       VIDEO DEPOSITION OF RICHARD KENNEDY
15                Irvine, California
16           Friday, September 27, 2024
17
18
19  Reported by:
    Heidi Hummel-Grant
20  CSR No. 12556
21  Pages 273 - 390
22
23
24
25

                                        Page 273
```

CONFIDENTIAL

```
1                UNITED STATES DISTRICT COURT
2            FOR THE SOUTHERN DISTRICT OF NEW YORK
3
4    WCA HOLDINGS III, LLC,          ) NO. 1:20-cv-7472
                                     )
5               Plaintiff,           )
                                     )
6         v.                         )
                                     )
7    PANASONIC AVIONICS CORPORATION,)
                                     )
8               Defendant.           )
     _____)
9
10
11
12               CONFIDENTIAL TRANSCRIPT
13                    VOLUME II
14        Video deposition of RICHARD KENNEDY, taken
15   on behalf of Plaintiff, at 1 Park Plaza, 12th Floor,
16   Irvine, California, beginning at 9:45 a.m. and
17   ending at 12:11 p.m., on Friday, September 27, 2024,
18   before Heidi Hummel-Grant, Certified Shorthand
19   Reporter No. 12556.
20
21
22
23
24
25
                                              Page 274
```

CONFIDENTIAL

```
 1    APPEARANCES:
 2
 3    For Plaintiff:
 4         K&L GATES LLP
 5         BY:  CHRISTOPHER M. WYANT (pro hac vice)
 6         925 Fourth Avenue
 7         Suite 2900
 8         Seattle, Washington 98014
 9         206.623.7580
10         chris.wyant@klgates.com
11
12    For Defendant:
13         FOX ROTHSCHILD LLP
14         BY:  JAMES H. MCCONNELL
15              WANDA FRENCH-BROWN
16         101 Park Avenue
17         17th Floor
18         New York, New York 10178
19         212.878.7900
20         jmcconnell@foxrothschild.com
21
22    Also present:
23         BERKLEY KIELHACK, VIDEOGRAPHER
24
25
```

Page 275

```
                        INDEX
Witness:
RICHARD KENNEDY


Examination:                                        Page
MR. WYANT                                           297


                       EXHIBITS
Number      Description                              Page
Exhibit 7   Amendment No. 4 to the General Terms    321
            Agreement
            (Previously Marked)
Exhibit 18  8/27/2020 Emails                        285
            Subject: RE SOW Template

Exhibit 19  Statement of Work Document              291

Exhibit 20  Spreadsheet                             300

Exhibit 21  Parts List Configuration                306

Exhibit 22  Engineering Kickoff VVIP/VIP            369
            In-Flight Entertainment / Cabin
            Management System

Exhibit 23  eX1 Porducts and Services               374
            Description Document (PSDD)

                 ^INSTRUCTED NOT TO ANSWER
                      Page   Line
                       293    15
                       354     6
```

Page 276

|    |                                                                    |       |
|----|--------------------------------------------------------------------|-------|
| 1  | Irvine, California                                                 |       |
| 2  | Friday, September 27, 2024, 9:45 a.m. - 12:11 p.m.                 |       |
| 3  |                                                                    |       |
| 4  | THE VIDEOGRAPHER: Good morning. We are                             |       |
| 5  | going on the record at 9:45 a.m. on Friday,                        | 09:45 |
| 6  | September 27th, 2004.                                              |       |
| 7  | Please note that the microphones are                               |       |
| 8  | sensitive and may pick up whispering and private                   |       |
| 9  | conversations. Please mute your phones at this                     |       |
| 10 | time.                                                              | 09:45 |
| 11 | This is Media Unit 1 of the video recorded                         |       |
| 12 | deposition of Richard Kennedy, Volume II, taken by                 |       |
| 13 | counsel for plaintiff in the matter of WCA Holdings                |       |
| 14 | III, LLC versus Panasonic Avionics Corporation,                    |       |
| 15 | filed in the United States District Court for the                  | 09:45 |
| 16 | Southern District of New York, Case Number                         |       |
| 17 | 1:20-cv-7472. The deposition is located at                         |       |
| 18 | K&L Gates LLP, 1 Park Plaza, 12th Floor, Irvine,                   |       |
| 19 | California, 92614.                                                 |       |
| 20 | My name is Berkley Kielhack representing                           | 09:45 |
| 21 | Veritext, and I'm the videographer. The court                      |       |
| 22 | reporter today is Heidi Hummel-Grant from the firm                 |       |
| 23 | Veritext. I'm not related to any party in this                     |       |
| 24 | action nor am I financially interested in the                      |       |
| 25 | outcome.                                                           | 09:46 |

Page 277

| | | |
|---|---|---|
| 1 | BBJ. | 10:15 |
| 2 | As part of this -- this was entirely a | |
| 3 | financial analysis to determine could we be | |
| 4 | compet -- could we provide a price that matched the | |
| 5 | ships at expectation.  So when we get over to the | 10:15 |
| 6 | cost and the priced on the right-hand side, | |
| 7 | basically what I was coming up with is what is our | |
| 8 | profit margin in order to be competitive in this | |
| 9 | market.  Okay? | |
| 10 | The configuration that I came up with for | 10:15 |
| 11 | all of these aircraft used known parts and parts | |
| 12 | that would have to be developed in order to get | |
| 13 | there.  They didn't exist at the time, they only | |
| 14 | existed on paper.  And again, it was with the | |
| 15 | concept of those parts -- because at the time, up | 10:16 |
| 16 | until 2016, we had partnered with LHT, we were using | |
| 17 | LHT parts in our system.  This effort was to remove | |
| 18 | LHT off the aircraft. | |
| 19 | Q    Were there comparable LHT parts to the | |
| 20 | ones you would have had to create that were new? | 10:16 |
| 21 | A    Yes.  Though I would say that mine would | |
| 22 | be more capable.  Mine.  Panasonic's. | |
| 23 | Q    And you put together a spreadsheet with | |
| 24 | a list of part numbers in it as a companion to this | |
| 25 | document that is Exhibit 20? | 10:16 |

Page 305

| | | |
|---|---|---|
| 1 | A   Yes. | 10:16 |
| 2 | Q   And those part numbers, did they exist | |
| 3 | at the time or were they aspirational? | |
| 4 | A   Aspiration -- well, the ones that | |
| 5 | existed, they would have exist, the other ones would | 10:16 |
| 6 | have been aspirational.  I think I actually used | |
| 7 | their name in the description. | |
| 8 | Q   So if there is a part number listed, | |
| 9 | that's an existing part number? | |
| 10 | A   If you want to give me an example, if we | 10:16 |
| 11 | want to route this as an exhibit, I -- I can point | |
| 12 | out which ones were aspirational versus not. | |
| 13 | THE REPORTER:  Exhibit 21. | |
| 14 | (Exhibit 21 was marked for identification by | |
| 15 | the Certified Shorthand Reporter, a copy of which is | 10:17 |
| 16 | attached hereto.) | |
| 17 | MR. WYANT: | |
| 18 | Q   So the court reporter has marked | |
| 19 | Exhibit 21, which I'll tell you is an Excel | |
| 20 | spreadsheet that is Panasonic 37265, and it is a | 10:17 |
| 21 | spreadsheet that has multiple tabs. | |
| 22 | What we're looking at here is what's called | |
| 23 | the detail tab. | |
| 24 | A   Um-hum. | |
| 25 | Q   You understand that? | 10:17 |

```
 1   So why don't we take a break?                          11:27
 2            THE WITNESS:  Sure.
 3            THE VIDEOGRAPHER:  Going off the record at
 4   11:27 a.m.
 5            (A recess is taken.)                          11:27
 6            THE VIDEOGRAPHER:  We are back on the record
 7   at 11:43 a.m.
 8            MR. WYANT:
 9       Q    Going back to Exhibit 21, just a couple
10   of more quick questions about that.                    11:43
11       A    Sure.
12       Q    So I think you said that for the
13   aspirational parts there would have been a
14   comparable IDAIR or LHT part for each one; is that
15   right?                                                 11:43
16       A    Correct, yes.
17       Q    And would there be pricing for each of
18   those comparable parts in the Panasonic price
19   database?
20            MR. MCCONNELL:  Objection to form.            11:44
21            THE WITNESS:  Possibly.  I don't know if we
22   had loaded those particular LHT part numbers into
23   our system; I know we had loaded the early
24   equipment into the system.
25            The -- once -- once the joint venture was     11:44
```

| | | |
|---|---|---|
| 1 | solidified, then there was no reason to load them | 11:44 |
| 2 | into Oracle because IDAIR was doing all of the work | |
| 3 | and Panasonic wasn't buying those parts necessary | |
| 4 | from LHT.  Again, as part of the JV there were | |
| 5 | agreed-to pricing structures between all three | 11:44 |
| 6 | companies.  I -- I don't know for sure if the | |
| 7 | equivalent LHT part that this one kind of references | |
| 8 | would have been there or not. | |
| 9 |     MR. WYANT:  Okay. | |
| 10 |     Q    So setting aside the actual pricing | 11:44 |
| 11 | database for a discrete control unit that was | |
| 12 | manufactured by LHT or IDAIR, does Panasonic have | |
| 13 | any document anywhere where you could go look and | |
| 14 | see what that price would be? | |
| 15 |     MR. MCCONNELL:  Objection to form. | 11:45 |
| 16 |     THE WITNESS:  Sorry, price for which one? | |
| 17 |     MR. WYANT: | |
| 18 |     Q    The LHT or IDAIR version of a discrete | |
| 19 | control unit. | |
| 20 |     MR. MCCONNELL:  Same objection. | 11:45 |
| 21 |     THE WITNESS:  Again, there was contracts | |
| 22 | language between LHT and Panasonic that defined the | |
| 23 | JV.  The pricing agreement for LRUs were -- were | |
| 24 | defined within that document.  For LHT they had an | |
| 25 | associated -- so they had -- they had an actual | 11:45 |

| | | |
|---|---|---|
| 1 | price list that was about, you know, maybe 30 part | 11:45 |
| 2 | numbers long that said, "This is what the cost of | |
| 3 | this unit is," to either Panasonic or to IDAIR. | |
| 4 | For Panasonic what the agreement was -- as | |
| 5 | we referenced earlier, we have FOB and S.  Okay? | 11:45 |
| 6 | There was a discount off of S, which is what IDAIR | |
| 7 | purchased the part at, and I can't remember what the | |
| 8 | discount was off the top of my head right now. | |
| 9 | MR. WYANT: | |
| 10 | Q    That's all very helpful. | 11:45 |
| 11 | But just keep it real simple:  Is there any | |
| 12 | way you could go find out the price of the discrete | |
| 13 | control unit for a version of that part that was | |
| 14 | manufactured by either IDAIR or LHT? | |
| 15 | MR. MCCONNELL:  Objection to form. | 11:46 |
| 16 | THE WITNESS:  Again, within the joint | |
| 17 | venture agreement between Panasonic and Lufthansa, | |
| 18 | in conjunction with the joint -- the joint venture | |
| 19 | itself, IDAIR, there was an agreed-to price list | |
| 20 | that was included as part of the -- I think it's an | 11:46 |
| 21 | amendment to that joint venture contract that | |
| 22 | defines what the pricing is.  And it would get | |
| 23 | updated, I think, every one to two years. | |
| 24 | MR. WYANT: | |
| 25 | Q    And that would include things like this | 11:46 |

| | | |
|---|---|---|
| 1 | discrete control unit? | 11:46 |
| 2 | MR. MCCONNELL:  Objection to form. | |
| 3 | THE WITNESS:  It wasn't called the discrete | |
| 4 | control unit, but it was a -- a functionally | |
| 5 | equivalent box in that perspective. | 11:46 |
| 6 | MR. WYANT:  Okay. | |
| 7 | Just for the record, we're going to rest -- | |
| 8 | request copies of whatever documents and agreements | |
| 9 | would identify the prices for the comparable LHT or | |
| 10 | IDAIR parts that are listed in Exhibit 21. | 11:47 |
| 11 | MS. FRENCH-BROWN:  You're asking for the | |
| 12 | joint venture agreement between LHT and Panasonic? | |
| 13 | MR. WYANT:  If -- if it has the pricing for | |
| 14 | the parts identified on Exhibit 1 -- or 21, yes. | |
| 15 | MS. FRENCH-BROWN:  If it has it, we'll -- | 11:47 |
| 16 | we'll look into that.  If the document still | |
| 17 | exists, we'll look into it. | |
| 18 | MR. WYANT:  Okay. | |
| 19 | THE REPORTER:  Exhibit 22. | |
| 20 | (Exhibit 22 was marked for identification by | |
| 21 | the Certified Shorthand Reporter, a copy of which is | |
| 22 | attached hereto.) | |
| 23 | MR. WYANT:  Okay. | |
| 24 | Q   Exhibit 22 is PAC37172 through 21. | |
| 25 | Do you recognize this document? | 11:47 |

| | | |
|---|---|---|
| 1 | Q I'm not going to ask any questions about | 11:52 |
| 2 | it. I just wanted to know if that's what Project | |
| 3 | Mithril was. | |
| 4 | A Yes. | |
| 5 | Q Similarly, this giant document, which is | 11:52 |
| 6 | 3765 through 37869, does that also relate to | |
| 7 | Project Mithril? | |
| 8 | MR. MCCONNELL: Do you have copies for us? | |
| 9 | MR. WYANT: Yeah. | |
| 10 | Q Or is it something different? | 11:52 |
| 11 | A This is something different. This is | |
| 12 | not related to Project Mithril. | |
| 13 | MR. WYANT: We'll mark this one. | |
| 14 | THE REPORTER: Exhibit 23. | |
| 15 | (Exhibit 23 was marked for identification by | 11:52 |
| 16 | the Certified Shorthand Reporter, a copy of which is | |
| 17 | attached hereto.) | |
| 18 | MR. WYANT: | |
| 19 | Q So as I noted, Exhibit 23 is 37675 | |
| 20 | through 37869. | 11:53 |
| 21 | A Um-hum. | |
| 22 | Q Can you tell me what this is? | |
| 23 | A This is a document that Panasonic | |
| 24 | marketing produces for customers, primarily | |
| 25 | commercial, it is what we refer to as our product | 11:53 |

Page 374

| | | |
|---|---|---|
| 1 | and services description document.  It is a -- it -- | 11:53 |
| 2 | it -- it's basically -- things that are available or | |
| 3 | could be available as part of an eX1 system | |
| 4 | delivery.  It's -- some of this is -- some of the | |
| 5 | information that's in here would be aspirational; | 11:53 |
| 6 | some of it would be existing, depending on where | |
| 7 | things are in development.  Again, this is more of | |
| 8 | a -- what I'd call a marketing document to basically | |
| 9 | figure out what would an airline customer be | |
| 10 | interested in. | 11:54 |
| 11 | So again, the aspirational stuff will get | |
| 12 | stuck in here, and if -- if an airline -- if | |
| 13 | airlines basically say, "We don't like it," then it | |
| 14 | will get removed.  This is more of a -- a living | |
| 15 | document that as -- as technology progresses, as we | 11:54 |
| 16 | deal with obsolescence of -- if a part becomes | |
| 17 | obsolete, we can't build it any more, then they'll | |
| 18 | get -- remove it from here.  They may introduce a | |
| 19 | replacement part based upon that, or we might | |
| 20 | just -- you know, we might just say, "Well, we're | 11:54 |
| 21 | not going to reproduce that part any more." | |
| 22 | So -- but this is really more of a -- for | |
| 23 | instance, if you're an airline and you came to us | |
| 24 | saying, "I want to buy some 737s.  I have got fifty | |
| 25 | 737s, I want to put your eX1 system on it.  What -- | 11:54 |

| | | |
|---|---|---|
| 1 | what can you provide me?"  This would probably be | 11:54 |
| 2 | sent to them.  And then obviously, again, there is | |
| 3 | so many pages here, people don't even tend to look | |
| 4 | at it, but it is a document that we produce in order | |
| 5 | to -- to meet that function. | 11:55 |
| 6 |     Q   So the first page is the initial | |
| 7 | release, it says on the reason for revision? | |
| 8 |     A   Yeah. | |
| 9 |     Q   ==Was this the first version of this== | |
| 10 | ==document?== | 11:55 |
| 11 |     A   ==More than likely, yes.== | |
| 12 | Up until that point in time we had a -- we | |
| 13 | had an eX2 document back in the -- in the late | |
| 14 | 2000s. | |
| 15 | Honestly speaking, what I would say is this | 11:55 |
| 16 | was kind of a backfill.  We realized we needed the | |
| 17 | document, we didn't have the document and somebody | |
| 18 | said, "Well, maybe we need to go off and create | |
| 19 | one."  There was a drive to release one for each | |
| 20 | system around this time frame in -- inside the | 11:55 |
| 21 | company.  Prior to that there was just a -- a PSDD | |
| 22 | for eX2 I think at that point in time. | |
| 23 |     Q   Do you know if subsequent to this | |
| 24 | initial release there were iterations of this | |
| 25 | product and services description document for eX1? | 11:56 |

Page 376

```
 1        A    This is certainly the first one for eX1       11:56
 2   as it's defined as an initial release.
 3        There was -- there is a prior to PSDD which
 4   was, again, more eX2 centric, more -- more wide-body
 5   centric I guess is what I would say.  And then it       11:56
 6   was decided that, "Hey, we should probably create a
 7   PSDD for every single system," and so there's --
 8   there's a PSDD for eX1, there's a PSDD for
 9   eXConnect, there's a PSDD for product and services.
10   They've -- they're -- I think there's like six or       11:56
11   seven of these things.
12        Q    My question's a little different, which
13   is:  Did this document get updated after its initial
14   release?
15        A    Oh, probably.  I would -- I would have        11:56
16   to go back and look at the revision history.
17        This is maintained in our document release
18   system as a part number.  So if there's a revision
19   update it would show up in -- inside what we would
20   purchase, Agile, which is our product -- document       11:57
21   repository system.
22        Q    Do you know if this document still
23   exists today?  Still being used today in some
24   version?
25        A    Almost certainly.                             11:57
```

Page 377