USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 07/25/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                    :
WCA HOLDINGS III, LLC,           :
                    :
             Plaintiff,   :        1:20-cv-7472-GHW
      -against-       :
                    :    MEMORANDUM OPINION &
PANASONIC AVIONICS CORPORATION,  :           ORDER
                    :
          Defendant.  :
                    :
------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

    Plaintiff WCA Holdings III, LLC ("WCA") is the owner of a private aircraft that Defendant

Panasonic Avionics Corporation ("Panasonic") agreed to outfit with new in-flight internet, cabin

management, and entertainment systems. After entering into a contract for that purpose in 2010,

Panasonic struggled to deliver, leaving WCA with what it viewed as an obsolete, poorly functioning

in-flight entertainment system. WCA sued for breach of contract in 2020 as a result.

    In September 2022, WCA's new general manager hired a former Panasonic engineer who

was familiar with WCA's aircraft to try to fix the plane's systems. The engineer ultimately swapped

out certain hardware components of the in-flight entertainment system. A week later, WCA's

outside counsel interviewed the former employee about the aircraft.

    In 2024, Panasonic learned about the maintenance work and the interview. Panasonic

moved for sanctions, arguing that WCA's counsel violated their ethical obligations to refrain from *ex

parte* interviews with represented parties. Panasonic also contends that WCA spoliated evidence

during the maintenance. Because WCA's counsel did not know that Panasonic represented the

former employee, and because he did not work for Panasonic at the time of the interview, WCA's

counsel did not violate their ethical obligations. Additionally, Panasonic has not demonstrated that

the allegedly spoliated evidence—namely, the pre-maintenance entertainment systems—were

relevant or favorable to its defense. Consequently, Panasonic's motion for sanctions is denied in its entirety.

## I.  BACKGROUND

The Court presumes the reader's familiarity with this case. The facts are described in several of the Court's previous orders. *See WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 479 (S.D.N.Y. 2023); *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 2025 WL 1434375, at *1 (S.D.N.Y. May 17, 2025). What follows are the facts and procedural history that are relevant to Panasonic's motion for sanctions.[1]

### A.  WCA Sues Panasonic for Installing an Allegedly Defective In-Flight Entertainment System in WCA's Private Aircraft

WCA commenced this lawsuit in September 2020. Dkt. No. 1.[2] At the time of WCA's allegedly sanctionable misconduct, the Amended Complaint was the operative complaint. The Amended Complaint's basic allegations centered on Panasonic's alleged breach of a 2010 contract in which Panasonic promised to outfit WCA's private aircraft with a new in-flight internet, cabin management, and entertainment system. *See* Amended Complaint ¶¶ 1–2, 15; Dkt. No. 35-2 (the "General Terms Agreement" or the "GTA"). Under the GTA, Panasonic agreed to install an antenna system that connected to a satellite in order to provide in-flight broadband internet service to the aircraft (the "eXConnect System"). Amended Complaint ¶ 15. Panasonic also promised to install a new cabin management and in-flight entertainment system (the "eX1 System"). *Id.* ¶ 19.[3] Finally, Panasonic agreed to install "any and all upgrades to the eX1 System available" as of

---

[1] *See* Dkt. No. 191; Dkt. No. 192 ("Mem."); Dkt. No. 193 ("French-Brown Decl."); Dkt. No. 194 ("Senk Decl."); Dkt. No. 216 ("Reply"); Dkt. No. 217; Dkt. No. 218; Dkt. No. 219 ("Supp."); Dkt. No. 228 ("Second Supp."); Dkt. No. 212 ("Opp"); Dkt. No. 213 ("McHugh Decl."); Dkt. No. 214 ("Spethman Decl."); Dkt. No. 215 ("Wyant Decl."); Dkt. No. 232 (opposition supplement); Dkt. No. 233 ("Ihle Decl.").

[2] WCA filed an amended complaint in December 2020. Dkt. No. 27 (the "Amended Complaint"). The Amended Complaint was the operative complaint from 2020 through 2024. As described below, WCA later filed a Second Amended Complaint after the Court dismissed several of WCA's claims.

[3] The eX1 System included a host of features, such as on-demand videos "streamed independently to each cabin zone, with high-definition video available from a media file server." *Id.* ¶ 19.

September 2017, including "touch screens, Blu-ray players, audio speakers, LCD cabin monitors, cabin handsets, system remote controls and related software" (the "Equipment Upgrades"). *Id.* ¶¶ 26, 37.

According to the Amended Complaint, Panasonic failed to deliver. Panasonic completed the installation of the eX1 System in the aircraft by 2013, *id.* ¶ 28, but the eX1 and eXConnect Systems allegedly did not function properly, *id.* ¶ 31. Among other failures, the systems allegedly did not "consistently provide streaming videos or television . . . or provide high-definition video and other cabin-management system requirements," as was promised. *Id.* ¶ 31. WCA alleged that the "failures occurred in part because Panasonic failed to install the eX1 and eXConnect systems pursuant to Panasonic's own specifications, as indicated by the failure of the systems to work as Panasonic itself expected and represented." *Id.*

In an attempt to remedy the situation, Panasonic tried to repair the eXConnect and eX1 Systems, with mixed results. *Id.* ¶ 33. "Despite the numerous efforts to resolve the failures in the combined eX1 and eXConnect system," the Amended Complaint alleged, "Panasonic has been unable or unwilling to put the eX1 and eXConnect systems in working condition." *Id.* ¶ 35. Accordingly, the Amended Complaint asserted claims for breach of contract for: (1) failure to install the eXConnect and eX1 Systems "in a fully working condition," (2) breach of the warranty provisions of the GTA "by failing and refusing to repair or replace" the eXConnect and eX1 Systems, and (3) breach of its obligation to "provide Equipment Upgrades to the Aircraft no later than September 2017." *Id.* ¶¶ 44–60.[4]

---

[4] It also asserted claims for breach of the implied covenant of good faith and fair dealing, including by failing to install the Equipment Upgrades in September 2017, and for promissory estoppel for Panasonic's alleged failure to provide the Equipment Upgrades. Amended Complaint ¶¶ 44–60.

### B.  One of Panasonic's Engineers Overseeing the WCA Project Leaves Panasonic

Panasonic had an "installation manager group" that "took care" of Panasonic's systems on the WCA aircraft project.  *See* Senk Decl. ¶ 3.  One of those managers was Rob Senk.  *Id.*  From September 2014 through July 2020, Mr. Senk worked as an aircraft installation manager for Panasonic, focusing generally on Panasonic's broadband internet connectivity systems, including the eXConnect product.  *Id.* ¶ 3.  He also had experience with Panasonic's in-flight entertainment systems, including the one installed on WCA's aircraft.  *Id.*

As one of the managers responsible for WCA, Mr. Senk worked on WCA's aircraft.  *Id.* ¶ 6. He also corresponded with Panasonic's in-house attorneys and other Panasonic employees "to address WCA's concerns" about the aircraft's systems.  *Id.*      He was also a "technical liaison" between WCA and Panasonic.  *Id.* ¶ 3.  Consequently, WCA knew about Mr. Senk while he worked at Panasonic.  *See* Wyant Decl. ¶ 4; French-Brown Decl. ¶ 4.[5]

In April 2021, Mr. Senk left Panasonic to work "full time at another firm."  Senk. Decl. ¶ 4.

### C.  WCA Hired the Former Panasonic Engineer to Work on the Aircraft

On June 23, 2022, over a year after Mr. Senk left Panasonic, WCA's new general manager of the flight department, Kynan Spethman, contacted Mr. Senk on LinkedIn to "see if he could help WCA with the ongoing issues with Panasonic's eX1 system installed on the Aircraft."  Spethman Decl. ¶ 3; Senk Decl. ¶ 7.  WCA had recently hired Mr. Spethman as general manager of the flight department in May 2022, and he was "looking for any help" to "try to make some of [the] systems" in the aircraft work.  French-Brown Decl. Exhibit 24 ("Spethman Depo. Tr.") 13:9-13. Mr. Spethman understood that Mr. Senk had previously worked on the aircraft and "was one of the few individuals that had knowledge of that aircraft and any ability to help us fix it."  *Id.* at 123:9-16.

---

[5] WCA identified Mr. Senk as a witness with discoverable information about the aircraft in its initial disclosures, which it served in December 2020.  Wyant Decl. ¶ 4; French-Brown Decl. ¶ 4.

Mr. Spethman also knew that Mr. Senk no longer worked at Panasonic because his new employer was listed on Mr. Senk's LinkedIn.  Spethman Decl. ¶ 3.

In August 2022, Mr. Spethman and Mr. Senk exchanged messages "via LinkedIn and email, and spoke to one another by phone."  Senk Decl. ¶ 8.  Mr. Senk "learned that Mr. Spethman had recently been hired as WCA's manager of the aviation department, and he was interested in learning about the [aircraft's in-flight entertainment] system."  *Id.*  Mr. Spethman invited Mr. Senk for an on-site visit in Missoula, Montana so that he could "advise on how [WCA] could repair elements of the eX1 system in the Aircraft, which had not worked for years."  Spethman Decl. ¶ 5; *see* Senk Decl. ¶ 9.  Mr. Senk agreed.  WCA paid Mr. Senk a consulting fee and covered his travel costs.  Senk Decl. ¶¶ 9–10.

On August 25, 2022, a lawyer and business advisor for WCA, Tim McHugh, emailed Mr. Spethman about Mr. Senk.  French-Brown Decl. Exhibit 12.[6]  Mr. McHugh asked, "Can we set up a call with Rob (the former Panasonic engineer) when he is on site the first week of September?"  *Id.*  The purpose of the call was for WCA's outside counsel, Christopher Wyant of the firm K&L Gates LLP, "to get a better understanding of what [Mr. Senk's] role was, what information he has about the system failures and availability of options to fix it over the years."  *Id.*  Mr. McHugh "had no knowledge of any representation agreement between Panasonic or its outside counsel and Mr. Senk at that time[.]"  McHugh Decl. ¶ 3.

From September 8–10, 2022, Mr. Senk worked on-site with the aircraft.  Senk Decl. ¶¶ 10–11.  He and Mr. Spethman spent approximately 15 hours working on the aircraft's eX1 System and using spare parts to attempt to fix it.  Senk Decl. ¶¶ 10–11; Spethman Decl. ¶¶ 5–8.  The spare parts

---

[6] Mr. McHugh described himself as follows:  "I am an officer of Plaintiff WCA Holdings III, LLC ('WCA').  I am also an officer of non-party Washington Corporations.  I am a lawyer licensed to practice in Montana . . . .  For approximately 20 years, I worked for the Washington Corporations or their affiliates and, in those roles, had responsibility for both legal matters and business matters."  McHugh Decl. ¶ 1.

"were already on site" and "had been provided by Panasonic." Spethman Decl. ¶ 8. Mr. Senk was "tasked with assessing components of the [in-flight entertainment] system, which required verifying hardware functionality and making hardware changes to various components." Senk Decl. ¶ 11.

In particular, Mr. Senk "worked on the eX1 [in-flight entertainment] system." *Id.* For context, the eX1 System has two main components: the aircraft interface and the content server. French-Brown Decl. Exhibit 8 at ECF page 6.[7] The content server "functions as a data file server" that "contains programs such as interactive menus, media . . . movies, music, and games," and "handles all the on-demand applications available to passengers." French-Brown Decl. Exhibit 36 ("Panasonic eX1 Training Guide") at ECF page 8. The aircraft interface is the "main controller" for the eX1 System. French-Brown Decl. Exhibit 35 ("Panasonic eXConnect Training Guide") at ECF page 8. While working on the eX1 System, Mr. Senk removed the content server and replaced it with a new one. Senk Decl. ¶ 11; Spethman Decl. ¶ 4. He also "reset the control panel," removed the existing DVD player and replaced it with a new one, and tested parts related to the "connection between the DVD player" and the television screen. Senk Decl. ¶ 11. He also "attempt[ed] to load software." *Id.*

On September 12, 2022, one of WCA's senior aircraft maintenance crew members, Andrew Ihle, also "attempted to replace the aircraft interface unit with a spare unit." Ihle Decl. ¶ 4. Mr. Ihle was ultimately "unable to load the required software to allow the replacement aircraft interface unit to function properly," so he "reinstalled" the original aircraft interface. *Id.* Mr. Senk was aware of this work; later that day, he emailed Mr. Spethman, stating that WCA's team was "replacing an AI" and working on loading software. French-Brown Decl. Exhibit 25 (email from Mr.

---

[7] One of Panasonic's witnesses, Richard Kennedy, explained the following during his deposition: "[I]f we take Washington Corp as an example . . . . The aircraft interface and the content server, those two boxes by themselves constitute eX1 on a narrow-body aircraft where the content server streams directly to seat boxes." French-Brown Decl. Exhibit 8 at ECF page 6.

Senk) at ECF page 21.

After the attempted maintenance was complete, WCA "saved the parts that were replaced and [is] still in possession of them." Spethman Decl. ¶ 8. WCA also took photos of the original DVD player and content server. *Id.* Exhibit A

There is no evidence that Mr. Senk or WCA's maintenance team worked on the eXConnect antenna. Mr. Spethman asserted: "Neither Mr. Senk nor WCA maintenance personnel performed any work on Panasonic's internet connectivity system, which includes an antenna on the Aircraft, and is known as the eXConnect system." *See* Spethman Decl. ¶ 6. "If the eXConnect antenna had required repair work, [WCA] would have had to use heavy equipment to access parts on the exterior of the Aircraft." *Id.* WCA "used no such equipment during Mr. Senk's visit and did not touch the antenna." *Id.* Neither Mr. Senk nor Mr. Ihle claimed to have worked on the antenna. *See generally* Senk Decl; Ihle Decl.

No evidence has been provided to the Court showing that Mr. Spethman or WCA's lawyers spoke with Mr. Senk about the litigation during Mr. Senk's on-site visit. Mr. Spethman spoke with Mr. Senk "at length about any and all knowledge and ideas he might have to try to fix this broken system," but not about the litigation. Spethman Depo. Tr. 121:12-22; Spethman Decl. ¶ 9. He also "did not attempt to talk about any conversations or emails between Mr. Senk and Panasonic's lawyers from his time as a Panasonic employee." *Id.* Rather, their "conversations during that visit dealt with how to repair the eX1 system to make it functional for an upcoming flight." *Id.* As for Mr. McHugh, he "stopped by" the aircraft to check in on the maintenance for "approximately 10 minutes or less" and "had a very brief discussion with Mr. Spethman and Mr. Senk about the progress of these repairs and related attempts to improve the functionality of those systems." McHugh Decl. ¶¶ 4–6. Mr. McHugh did "not speak with Mr. Senk about the lawsuit with Panasonic, about Mr. Senk's prior work for Panasonic, or about any confidential or privileged

information" or "any substantive aspect of this litigation." *Id.* Panasonic has offered no evidence to the contrary.

### D. WCA's Outside Counsel Interviews Mr. Senk

About a week after Mr. Senk left Missoula, Mr. Spethman contacted Mr. Senk to set up a call with Mr. Senk and WCA's outside counsel, Mr. Wyant. Spethman Decl. ¶ 10. Mr. Spethman affirmed that he contacted Mr. Senk "and asked if he would join a call to answer some questions about the Panasonic lawsuit from WCA's lawyer." *Id.* According to Mr. Spethman, "Mr. Senk knew that he would be speaking to an attorney because I specifically recall that he expressed some concerns about speaking with an attorney, as it made him nervous." *Id.* Throughout September 2022, Mr. Senk and Mr. Spethman continued to communicate about fixing the aircraft. Senk Decl. ¶ 12.[8]

On September 19, 2022, Mr. Senk had a conference call with Mr. Wyant and Mr. Spethman about Panasonic's eX1 and eXConnect Systems. *Id.* ¶ 11; Wyant Decl. ¶ 9; French-Brown Decl. Exhibit Ex. 25 at ECF page 3. Mr. McHugh did not participate because he had a scheduling conflict. McHugh Decl. ¶ 8; Wyant Decl. ¶ 12. According to Mr. Wyant, at the beginning of the call, he identified himself as an attorney representing WCA in the lawsuit against Panasonic and asked Mr. Senk if any attorney represented him. Wyant Decl. ¶ 10. Mr. Wyant stated that, in response, Mr. Senk answered that he did not have a lawyer. *Id.* Mr. Wyant also informed Mr. Senk that the interview would include questions about Mr. Senk's work on the aircraft while at Panasonic, but that Mr. Wyant did not intend to discuss communications between Mr. Senk and any attorneys. *Id.* ¶ 11. According to Mr. Wyant, Mr. Senk stated that he understood. *Id.* Mr. Wyant also affirmed that, during the interview, the only information that he asked about concerned Mr. Senk's

---

[8] These conversations, Mr. Senk asserted, concerned "the work I did to the eX1 [in flight-entertainment] system installed on the [aircraft]" and about other "feedback about the eXConnect and eX1 systems." Senk Decl. ¶ 12.

recollection of his own prior efforts to physically repair the aircraft and "whether there was any way to repair the Aircraft as of September 2022." *Id.* ¶ 13. Mr. Senk stated that "he and others at Panasonic had done what they could to make repairs when WCA had complaints about something not working." *Id.*

Mr. Senk recalls having "telephone conversions with individuals from WCA" about the aircraft, including one conversation between himself, "Mr. Spethman and two other individuals associated with WCA." Senk Decl. ¶ 12. He does not recall, however, speaking "with any of WCA's attorneys at K&L Gates or anyone identified as WCA's lawyer." *Id.* ¶ 13.

After the call, Mr. Spethman "reported back" to Mr. McHugh that "Mr. Senk had stated that we could reach out to Panasonic to see if they would help WCA update the software for the eX1, but that they might not provide any assistance because of the ongoing litigation." Spethman Decl. ¶ 11.

### E. Panasonic Learns that WCA's General Manager Contracted Mr. Senk to Work on the Aircraft, and that WCA's Outside Counsel Interviewed Mr. Senk

Following the end of a discovery stay that had been in place since September 2021, Dkt. No. 72, Panasonic deposed Mr. McHugh on June 18, 2024. French-Brown Decl. ¶ 16. During the deposition, Panasonic asked Mr. McHugh about his August 25, 2022 email asking Mr. Spethman to arrange the call with Mr. Senk and WCA's outside counsel. *Id.* ¶ 17. WCA had produced the August 25, 2022 email earlier in discovery. *Id.* Exhibit 13. In the email, Mr. McHugh only referred to "Rob," and during the deposition, Mr. McHugh stated that he could not recall what "Rob's" last name was, or who at WCA had initially reached out to him. *Id.* Exhibit 11 ("McHugh Depo. Tr.") at 202:16–205:18. Mr. McHugh recalled only that Mr. Senk had worked at Panasonic previously, when he did "independent consulting" for WCA. *Id.*

On June 18, 2024, after the McHugh deposition, Panasonic contacted Mr. Wyant by email. Panasonic requested "additional documents and information" about WCA's interactions with

Mr. Senk.  French-Brown Decl. ¶ 18.  Panasonic listed six specific questions, including a request for "Rob's" last name to verify his identity.  *Id.*  Exhibit 13.  Mr. Wyant responded the next day.  He confirmed that Mr. McHugh had been referring to Mr. Senk.  Mr. Wyant expressed his view that, because Mr. Senk was a former Panasonic employee, it had been appropriate for Mr. McHugh to contact Mr. Senk.  *Id.* Exhibit 14.  He also noted that "WCA had no obligation to answer interrogatory questions posed in your letter . . . ."  *Id.*  Panasonic replied, stating "to the extent that WCA or its counsel has attempted to engage in witness tampering, [Panasonic] intends to seek all appropriate and necessary relief."  *Id.*  Around July 1, 2024, Panasonic met with Mr. Senk.  He had since returned to work at Panasonic, having been rehired on December 11, 2023.  Senk Decl. ¶¶ 4, 14; French-Brown Decl. ¶ 20.  Panasonic learned that Mr. Senk had been paid to work on the aircraft.  French Brown Decl. ¶ 19.

On August 27, 2024, Panasonic reached out to WCA's outside counsel and requested more information.  *Id.* ¶ 24.  Panasonic accused WCA of "intentionally withholding documents" about Mr. Senk and sought "any and all documents and communications exchanged" between WCA and Mr. Senk.  *Id.* Exhibit 20.  A lawyer for WCA responded the same day, explaining that WCA had previously searched for documents based on the parties' previously agreed upon search terms and produced the responsive documents.  *Id.*  The WCA lawyer stated:  "We did not withhold any responsive documents identified in the search other than on the grounds of privilege."  *Id.*

On September 6, 2024, the parties met and conferred.  *Id.* ¶ 26.  During the conference, Mr. Wyant explained that he had interviewed Mr. Senk but said that he had confirmed before starting the interview that Mr. Senk did not have counsel.  *Id.* ¶ 27.  He also agreed to "conduct a further search" for communications with Mr. Senk.  *Id.*  Panasonic followed up on September 12, 2024.  *Id.* ¶ 28.  Mr. Wyant responded that WCA was working on the request.  *Id.*  On September 19, 2024, Panasonic deposed Mr. Spethman.  On September 27, 2024, WCA produced 82 documents

10

consisting of communications "to, from, and about Mr. Senk and his September 2022 work." *Id.* ¶ 30.

### F. Procedural History

WCA filed suit in September 2020.  Dkt. No. 1.  WCA filed the Amended Complaint on December 3, 2020.  The Amended Complaint asserted the following causes of action:  (1) breach of contract for (a) "failing to install the eXConnect and eX1 Systems in a fully working condition and in the manner described in the GTA and related specifications for the eX1 system," (b) breach of the warranty provisions of the GTA "by failing and refusing to repair or replace" the eXConnect and eX1 Systems, and (c) breach of its obligation to "provide Equipment Upgrades to the Aircraft no later than September 2017"; (2) breach of the implied covenant of good faith and fair dealing, including by failing to install the Equipment Upgrades in September 2017; and (3) promissory estoppel for Panasonic's alleged failure to provide the Equipment Upgrades.  Amended Complaint ¶¶ 44–60.

The Court issued a case management plan and scheduling order in November 2020, which launched the parties into discovery.  Dkt. No. 22.  On September 29, 2021, the case was stayed. Dkt. Nos. 53.  On December 5, 2023, the Court granted a motion to dismiss by Panasonic in part. Dkt. No. 67.  The Court dismissed the breach of contract and breach of warranty claims as to the eX1 System.  *Id.* at 35.  The Court also dismissed the breach of the implied covenant and fair dealing claim, and the promissory estoppel claim.  *Id.*  The Court granted WCA leave to file a second amended complaint.  Dkt. No. 141.  On August 7, 2024, WCA filed a second amended complaint. Dkt. No. 142 (the "Second Amended Complaint").  The Second Amended Complaint asserts a single claim for breach of contract.  There are two alleged breaches:  (1) Panasonic breached the GTA, including its warranty provisions, by failing to install the eXConnect System in a fully working

condition, and refusing to repair or replace it "to put it in good working condition" (2) Panasonic breached the "Equipment Upgrade" provision of the GTA.

In this motion, Panasonic has requested the imposition of sanctions against WCA for allegedly violating the New York Rules of Professional Conduct and for spoliation of evidence. *See* Mem. Panasonic argues that WCA's counsel, Mr. McHugh and Mr. Wyant, violated New York Rule of Professional Conduct when they interviewed Panasonic's former employee, Mr. Senk, without disclosing that they were WCA's lawyers and without receiving consent from Panasonic. Mem at 17–24. Panasonic also contends that WCA engaged in spoliation of evidence because it altered, replaced, and discarded components of the eX1 and eXConnect Systems before it had the opportunity to inspect the aircraft. Mem. at 24–27.

WCA opposed the motion. *See* Opp. WCA argues that because Mr. Senk was not a current Panasonic employee when Mr. Wyant interviewed him, the interview did not violate any ethical rules. WCA also contends that its lawyers had no knowledge that Panasonic represented Mr. Senk. With respect to the spoliation allegations, WCA argues that it was not under a duty to preserve all components of aircraft indefinitely. Opp. at 20–21. Rather, it contends that Panasonic had ample opportunity to inspect the aircraft but chose not to and, in any case, the allegedly altered components are irrelevant to the remaining claims in the case. *Id.*

## II.    LEGAL STANDARD

### A.  The New York Rules of Professional Responsibility

"As a general matter, the 'salutary provisions [of New York's ethical rules] have consistently been relied upon by the courts of this district and circuit in evaluating the ethical conduct of attorneys.'" *United States v. Quest Diagnostics Inc.*, 734 F.3d 154, 163 (2d Cir. 2013) (alterations in original). Under New York Rule of Professional Conduct Rule 4.2(a), "a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party

the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law." N.Y. Rules of Prof'l Conduct 4.2(a) ("Rule 4.2(a)"). "Courts in this Circuit have adopted a three-part test to determine whether counsel has violated [Rule 4.2(a)]: Did counsel communicate with a 'party'? If so, did counsel know that the party was represented by a lawyer in this matter? Finally, did counsel 'cause' the communication to occur?" *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119, 124 (S.D.N.Y. 1999).

As indicated by the first part of the test, Rule 4.2(a) only applies to communications with "a party" to the lawsuit. *Id.* When the "party" is an organization, Rule 4.2(a) "applies only to certain current employees[.]" *See Muriel Siebert & Co. v. Intuit Inc.*, 8 N.Y.3d 506, 511 (2007) (citing *Niesig v. Team I*, 76 N.Y.2d 363 (1990)).[9] "A lawyer may have *ex parte* contact with the opposing party's former employees." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 416 (S.D.N.Y. 2011); *see also Muniz v. Re Spec Corp.*, 230 F. Supp. 3d 147, 157 (S.D.N.Y. 2017) (explaining that "*Niesig* drew a bright line between present and former employees."). "Counsel must still conform to all applicable ethical standards when conducting such interviews." *Muriel Siebert & Co.*, 8 N.Y.3d at 512 ("[T]he right to conduct *ex parte* interviews is [not] a license for adversary counsel to elicit privileged or confidential information from an opponent's former employee."); *see also* Rule 4.2 Comment 7 ("In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization."). But "so long as measures are taken to steer clear of privileged or confidential information, adversary counsel may conduct *ex parte* interviews of an opposing party's former employee." *Arons v. Jutkowitz*, 9 N.Y.3d 393, 408 (2007).

---

[9] In *Niesig*, "the New York Court of Appeals considered whether the employees of a corporate party [are] also considered parties for purposes of Disciplinary Rule 7–104(A)(1), which predated [Rule] 4.2(a) and contained the same ethical prohibition on *ex parte* contacts with represented parties." *See Muniz v. Re Spec Corp.*, 230 F. Supp. 3d 147, 156 (S.D.N.Y. 2017).

Second, Rule 4.2(a) requires "actual knowledge of the representation." *S.E.C. v. Lines*, 669 F. Supp. 2d 460, 463 (S.D.N.Y. 2009). Comment 8 to the rule provides:

> The prohibition on communications with a represented party applies only in circumstances where the lawyer knows that the party is in fact represented in the matter to be discussed. This means that the lawyer has actual knowledge of the fact of the representation; but such knowledge may be inferred from the circumstances . . . . Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by ignoring the obvious.

*Id.* "'[W]here [a] lawyer knows' that a person is represented by counsel in a matter at issue, the lawyer may not communicate with her, 'even though the represented person initiates or consents to the communication.'" *Harris v. F. Schumacher & Co., LLC*, 2024 WL 4240782, at *5 (S.D.N.Y. Sept. 19, 2024) *(quoting Lines*, 669 F. Supp. 2d at 463).

Third, "[a]n attorney's conduct may run afoul of [Rule 4.2(a)] only when he [directly] communicates or he causes someone else to communicate *ex parte* with a party . . . ." *Miano v. AC & R Advert., Inc.*, 148 F.R.D. 68, 77 (S.D.N.Y.), *as amended* (Mar. 4, 1993), *adopted*, 834 F. Supp. 632 (S.D.N.Y. 1993) (emphasis omitted) (evaluating whether a lawyer violated the rule that pre-dated Rule 4.2 by "causing" someone else to violate the rule, even if the lawyer was not "personally engaged in clandestine [unethical] activity.")

Federal courts have discretion to impose various remedies for ethical violations. *See Quest Diagnostics Inc.*, 734 F.3d at 166; *see also Bacote v. Riverbay Corp.*, 2017 WL 945103, at *6 (S.D.N.Y. Mar. 10, 2017) (collecting cases). The Second Circuit has "long recognized 'the power of trial judges to disqualify [attorneys] where necessary to preserve the integrity of the adversary process' most commonly 'where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation.'" *Quest Diagnostics Inc.*, 734 F.3d at 166. "Dismissal of a complaint prepared in reliance on privileged information may also be an appropriate remedy." *Id.* (collecting cases in which complaints were prepared in reliance on improper disclosures by the opposing party's former counsel). "Federal courts also have discretion to exclude

14

evidence unethically obtained by attorneys." *Bacote*, 2017 WL 945103, at \*6; *see Lines*, 669 F. Supp.

2d at 464 ("If a party is found to have violated Rule 4.2, a court may exercise its discretion to

exclude the resulting statements from evidence").

When fashioning a remedy for ethical violations, the Second Circuit has explained that,

"notwithstanding any salutary effect on attorney ethics or the appearance of fairness, dismissal [of a

complaint] or disqualification for violations of ethical rules may impede the pursuit of meritorious

litigation to the detriment of the justice system." *Quest Diagnostics Inc.*, 734 F.3d at 166 (citing *Fund of*

*Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 236 (2d Cir. 1977) (affirming a district court's

refusal to dismiss a complaint due to ethical violations on the ground that "we are loathe to

countenance a remedy which will affect the rights of a plaintiff embarked on serious litigation")).

"Accordingly, courts must balance these competing concerns by limiting remedies for ethical

violations to those necessary to avoid 'taint[ing] the underlying trial.'" *Id.*

### B. Spoliation of Evidence

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve

property for another's use as evidence in pending or reasonably foreseeable litigation." *ELG Utica*

*Alloys, Inc. v. Niagara Mohawk Power Corp.*, No. 23-7575, 2025 WL 1962141, at \*8 (2d Cir. July 17,

2025). "A party seeking sanctions based on spoliation must establish by a preponderance of

evidence: '(1) that the party having control over the evidence had an obligation to preserve it at the

time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that

the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of

fact could find that it would support that claim or defense.'" *Id.* (quoting *Klipsch Grp., Inc. v. ePRO E-*

*Com. Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018)).

With respect to the first element—the obligation to preserve evidence—the Second Circuit

has held that "[t]he obligation to preserve evidence arises when the party has notice that the

evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.*" Id.* (citing *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "The duty requires that anyone who is a party to a lawsuit not destroy unique evidence that it knows, or reasonably should know, is relevant in the action." *Taylor v. City of New York*, 293 F.R.D. 601, 609–10 (S.D.N.Y. 2013) (cleaned up).

As for the second element—culpable state of mind—"[a] party may establish a culpable state of mind by showing that the evidence was destroyed knowingly, even if without intent to [breach a duty to preserve it], or negligently." *ELG Utica Alloys, Inc.*, 2025 WL 1962141, at *9 (alteration in original) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002)); *see also Taylor*, 293 F.R.D. at 612 (citing *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (acknowledging that the failure to preserve evidence can fall "along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality")).[10]

To satisfy the final element—relevance—"a party seeking sanctions for spoliation must 'adduce sufficient evidence from which a reasonable trier of fact could infer [that] the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.'" *Taylor*, 293 F.R.D. at 613 (quoting *Residential Funding Corp.,* 306 F.3d at 108–09). The Second Circuit has made "clear that 'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Residential Funding Corp.*, 306 F.3d at 108–09. "In the context of a motion for spoliation sanctions, 'relevance' means that 'the destroyed evidence would have been favorable to the movant.'" *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d

---

[10] "[I]n 2015, Federal Rule of Civil Procedure 37(e) was amended to specify the measures a court could employ if electronically stored information ('ESI') was wrongfully lost and the findings required to order such measures." *Hoffer v. Tellone*, 128 F.4th 433, 437–38 (2d Cir. 2025). Following the amendment, the Second Circuit held that, "in the context of lost ESI . . . [a] party's acting negligently or knowingly will not suffice," unlike in cases involving physical evidence. *See id.* at 438–39. The Second Circuit made clear, however, that "in deciding the foregoing, we do not call into question the applicability of *Residential Funding* to . . . cases evaluating the loss of non-electronic evidence." *Id.*

570, 580 (S.D.N.Y. 2017); *Taylor*, 293 F.R.D. at 613 ("[T]he moving party must demonstrate not only that the spoliator destroyed 'relevant' evidence as that term is ordinarily understood, but also that the evidence it destroyed would have been of some 'assistive relevance' and favorable to the moving party's claims or defenses.").

"Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." *Residential Funding Corp.*, 306 F.3d at 109; *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) ("It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."). "Similarly, a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." *Residential Funding Corp.*, 306 F.3d at 109.

Accordingly, where a party "adduces evidence that its opponent destroyed potential evidence (or otherwise rendered it unavailable) in bad faith or through gross negligence (satisfying the 'culpable state of mind' factor), that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the 'relevance' factor)." *Id.* A party "need not, however, rely on the same evidence to establish that the missing evidence is 'relevant' as it uses to establish the opponent's 'culpable state of mind.'" *Id.* (explaining that in *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 110 (2d Cir. 2001), the movant "established relevance through deposition testimony regarding the nature of the missing documents[.]").

"However, 'where the culpable party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party.'" *Great N. Ins. Co. v. Power Cooling, Inc.*, 2007 WL 2687666, at *11 (E.D.N.Y. Sept. 10, 2007); *see also Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 439 (S.D.N.Y. 2010) ("In the absence of bad faith or other sufficiently egregious conduct, it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him.") (internal quotation marks omitted). "The party seeking sanctions in such cases must therefore affirmatively 'demonstrate that a reasonable trier of fact could find that the missing [evidence] would support [his] claims.'" *Orbit One Commc'ns, Inc.*, 271 F.R.D. at 439 (alterations in original). "Such a showing can be made on the basis of extrinsic evidence." *Id.* (collecting cases); *see also Taylor*, 293 F.R.D. at 613 (same). "Just how much evidence is enough to support an inference about the content of destroyed evidence cannot be precisely defined, and will necessarily vary from case to case, but . . . 'care should be taken' not to require too specific a level of proof." *Kronisch*, 150 F.3d at 128.

"[E]ven where a party has shown that its opponent had an obligation to preserve certain evidence and *willfully* failed to do so . . . the district court retains its discretion to impose discovery sanctions—or not[.]" *See Klipsch Grp., Inc.*, 880 F.3d at 630 (emphasis original) (citing *Fujitsu Ltd.*, 247 F.3d at 436) (concluding that the district court did not abuse its discretion "when it chose not to infer that the lost [evidence] would have included information that was relevant or that its unavailability prejudiced [the movant].""). *Id.* Similarly, "a finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction" for spoliation. *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis." *Fujitsu Ltd.*, 247 F.3d at 436 (internal citations omitted).

III.    DISCUSSION

    A.    **Sanctions Against WCA for Allegedly Violating New York's Ethical Rules Are Not Appropriate**

        1.    **Panasonic Has Not Established that WCA Violated Rule 4.2(a)**

Panasonic has not demonstrated that either Mr. Wyant or Mr. McHugh violated Rule 4.2(a) when Mr. Wyant interviewed Panasonic's former employee, Mr. Senk, because Mr. Senk was not a "party" under the rule, and because Panasonic has not shown that either lawyer knew that Panasonic represented Mr. Senk.[11]  As a former employee, Mr. Senk was not a "party" for purposes of Rule 4.2(a).  As above, Rule 4.2(a) applies "only to certain current employees" of an organization. *See Muriel Siebert & Co.*, 8 N.Y.3d at 511.  Mr. Senk did not work at Panasonic when Mr. Wyant interviewed him on September 19, 2022; he had not worked for Panasonic since April 6, 2021. *See* Senk. Decl. ¶¶ 4, 12.  So long as measures were "taken to steer clear of privileged or confidential information," *Arons*, 9 N.Y.3d at 408, WCA's lawyers were permitted to conduct the *ex parte* interview.

There is also no evidence that either Mr. McHugh or Mr. Wyant conducted the *ex parte* interview knowing that Panasonic represented Mr. Senk.  *See Lines*, 669 F. Supp. 2d at 463 (explaining that Rule 4.2(a) requires "actual knowledge of the representation.").  As an initial matter, Panasonic has not established that Mr. McHugh participated in the interview at all.  Mr. McHugh, Mr. Wyant, and Mr. Spethman each assert that Mr. McHugh did not join the call.  McHugh Decl. ¶ 8; Wyant Decl. ¶ 12; Spethman Decl. ¶ 11.  Mr. Wyant was the only lawyer who participated

---

[11] As the party seeking sanctions for the alleged ethical violation, Panasonic bears the burden of proof.  *See, e.g., Bacote*, 2017 WL 945103, at *8 ("Defendants have not established that Cohen violated Rule 4.2 by communicating with former employee); *Gidatex, S.r.L.*, 82 F. Supp. 2d at 120 (moving party "failed to meet its burden of demonstrating" that opposing counsel violated the ethical rules); *cf. Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009) ("Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny" and "the movant, therefore, 'bears the burden . . . .'") (internal citations omitted); *see also Tylena M. v. Heartshare Human Servs.*, 2004 WL 1252945, at *2 (S.D.N.Y. June 7, 2004) (finding that defendants had not met their burden in seeking disqualification of counsel under the prior Rule 4.2(a)).

in the approximately ten-minute call with Mr. Senk.  In any case, Mr. McHugh asserted that he "had

no knowledge of any representation agreement between Panasonic or its outside counsel and Mr.

Senk" at the time.  McHugh Decl. ¶ 3.  Mr. Wyant also asserted that he "had no knowledge of any

representation agreement between any counsel and Mr. Senk at that time . . . ."  Wyant Decl. ¶ 6.

Mr. Wyant also stated that, prior to the interview with Mr. Senk, he identified himself as one of

WCA's attorneys and affirmatively asked Mr. Senk if he had counsel.  *Id.* ¶ 10.  According to Mr.

Wyant, Mr. Senk answered that he did not have a lawyer.  *Id.*

      Panasonic offers no evidence to rebut Mr. Wyant's assertion that Mr. Senk told him that Mr.

Senk did not have a lawyer.  Panasonic argues that Mr. Senk's claim that he did not recall speaking to

anyone "identified as WCA's lawyer," Senk Decl. ¶ 13, contradicts Mr. Wyant's assertion.  But Mr.

Senk's lack of memory does not contradict Mr. Wyant's affirmative representation that Mr. Senk

confirmed his lack of representation.  *Cf. FDIC v. National Union Fire Ins. Co.,* 205 F.3d 66, 75

(2d Cir. 2000) ("[M]emory lapses . . . do not create genuine issues of material fact."); *Stever v. CSX*

*Transportation, Inc.*, 2023 WL 8806203, at *18 nn.33, 107 (N.D.N.Y. Dec. 20, 2023) (noting that a

witness's "lack of memory of [a] fact does not constitute evidence that it never happened").

Consequently, the lack of memory by Mr. Senk—a lay person unattuned to the ethical rules

governing lawyers' conduct—does not contradict the sworn representation of Mr. Wyant, an

experienced litigator who is familiar with and likely to pay attention to "the ethical requirements

arising from such witness interviews."  *See* Wyant Decl. ¶ 14.  Moreover, neither Mr. Senk nor

Panasonic have asserted that they ever told WCA that Panasonic represented Mr. Senk.

      Panasonic also argues that Mr. Wyant had actual knowledge that it represented Mr. Senk

because, in 2020, Mr. Wyant listed Mr. Senk as a witness likely to have information about the aircraft

in WCA's Fed. R. Civ. P. 26(a)(1) initial disclosures.  This argument does not satisfy Panasonic's

burden.  There is no dispute that Mr. Wyant was aware of Mr. Senk and identified him as a witness

with discoverable information about the aircraft in December 2020.  Wyant Decl. ¶ 4;

French-Brown Decl. ¶ 4.  That does not prove that Mr. Wyant had actual knowledge that Panasonic

represented him in 2022, over a year after he left the company.

Panasonic has also not established that Mr. Wyant failed to take sufficient "measures . . . to

steer clear of privileged or confidential information" or otherwise failed to "conform to all

applicable ethical standards" during the interview.  *See Muriel Siebert & Co.,* 8 N.Y.3d at 511

(concluding that defendant's attorneys properly advised a plaintiff's former COO "of their

representation and interest in the litigation, and directed [the COO] to avoid disclosing privileged or

confidential information . . . .").  Mr. Wyant asserted that he explained to Mr. Senk that although the

interview would include questions about Mr. Senk's work on the aircraft while at Panasonic, he did

not intend to discuss communications between Mr. Senk and any attorneys.  Wyant Decl. ¶ 11.

According to Mr. Wyant, Mr. Senk stated he understood.  *Id.*  Mr. Wyant also contends that, during

the interview, the only information he asked about involved:  "(i) Mr. Senk's recollection of his own

prior efforts to physically repair WCA's aircraft (including his communications with WCA staff

when doing so), and (ii) whether there was any existing means to work with Panasonic to repair the

aircraft as of September 2022 given the pending litigation."  Opp. at 6–7; Wyant Decl. ¶ 13.

Panasonic does not rebut these assertions.  Consequently, Panasonic has not established that any of

WCA's lawyers violated Rule 4.2(a).

### 2.  Panasonic Has Not Established that WCA Violated Rule 4.3

Panasonic also claims as an alternative that Mr. McHugh and Mr. Wyant violated New York

Rule of Professional Conduct Rule 4.3 by failing to disclose to Mr. Senk that he was speaking with

an attorney at the time he was interviewed, but this argument is also without merit.  New York Rule

of Professional Conduct Rule 4.3 governs communications with unrepresented persons. It provides

in relevant part:

> In communicating on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

N.Y. Rules of Prof'l Conduct 4.3. Here, Panasonic has not established that either Mr. McHugh or

Mr. Wyant violated this rule. As explained, Mr. McHugh did not participate in the interview of Mr.

Senk. Panasonic has also not established that Mr. Wyant suggested that he was disinterested, or that

he knew or should have known that Mr. Senk misunderstood his role. Mr. Senk asserted only that

he does not recall speaking to anyone "identified as WCA's lawyer." Senk Decl. ¶ 13. As described

above, this does not contradict Mr. Wyant's sworn declaration that he did, in fact, identify himself

and his stake in the litigation. Accordingly, Panasonic has not demonstrated that WCA's counsel

violated their ethical obligations when they interviewed Mr. Senk.[12]

### 3. Panasonic Has Not Demonstrated That Sanctions Are Appropriate Under the Court's Inherent Power to Sanction Attorneys Who Act in Bad Faith

Panasonic argues that the Court should sanction Mr. Wyant and Mr. McHugh under the

Court's inherent authority to sanction lawyers because they violated the ethical rules in bad faith, but

Panasonic has not established that either lawyer violated the ethical rules at all or otherwise acted "in

bad faith, vexatiously, wantonly, or for oppressive reasons." *See Ransmeier v. Mariani*, 718 F.3d 64, 68

(2d Cir. 2013). According to Panasonic, Mr. McHugh's and Mr. Wyant's allegedly unethical "actions

---

[12] Panasonic also accuses Mr. Wyant and Mr. McHugh of violating Rule 8.4(a), 8.4(c), and 8.4(d) "through their violations of Rule 4.2 and 4.3 . . . ." Mem. at 23. Rule 8.4 states: "A lawyer or law firm shall not: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; or (d) engage in conduct that is prejudicial to the administration of justice[.]" N.Y. Rules of Prof'l Conduct Rule 8.4(a), (c)–(d). Because Panasonic has not established that WCA's lawyers violated any ethical obligations in speaking with Mr. Senk, and because Panasonic has not demonstrated that they engaged in any dishonesty, fraud, deceit or misrepresentation, this argument is meritless.

involving Mr. Senk were entirely without color and motivated by improper purposes." Mem. at 18. Because the lawyers' conduct "has been especially egregious," it contends, the Court should sanction WCA's counsel for their bad faith violation of the ethical rules. Mem. at 19–20.

The Court has the authority to impose sanctions under its "inherent power to control the proceedings that take place before this Court." *Ransmeier*, 718 F.3d at 68 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44 (1991)). "[A] federal court . . . may exercise its inherent power to sanction a party or an attorney who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* "Imposition of sanctions under a court's inherent powers requires a specific finding that an attorney acted in bad faith." *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). "Moreover, inherent-power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Id.* "Conduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Id.* "A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Id.*

Here, Panasonic has not established that Mr. Wyant or Mr. McHugh acted in bad faith, or that speaking with Mr. Senk was "(1) entirely without color and (2) motivated by improper purposes." *Wolters Kluwer Fin. Servs., Inc.*, 564 F.3d at 114. First, as above, Panasonic has not demonstrated that Mr. Wyant or Mr. McHugh violated New York's ethical rules, which have "consistently been relied upon by the courts of this district and circuit in evaluating the ethical conduct of attorneys." *Quest Diagnostics Inc.*, 734 F.3d at 163. The Court cannot find that they violated the ethical rules in bad faith or that their actions were "entirely without color" because Panasonic has not shown that they violated the ethical rules at all. *Compare Phillips v. Fashion Inst. of*

*Tech.*, 2024 WL 4103596, at *4 (S.D.N.Y. Sept. 6, 2024) (sanctioning a lawyer who "violated rule 4.2(a) in bad faith").

Panasonic argues that Mr. Wyant and Mr. McHugh also "stonewalled" discovery regarding Mr. Senk's work on the aircraft, but the record belies that contention. In the ordinary course of discovery, WCA produced—rather than withheld—the August 25, 2022 email in which Mr. McHugh asked Mr. Spethman about Mr. Senk's upcoming on-site visit. Mem. at 6; French-Brown Decl. Exhibit 13. Panasonic had the opportunity to and did question Mr. McHugh during his deposition about this email and about Mr. Senk's work. French-Brown Decl. ¶ 17.

When Panasonic followed up with Mr. Wyant after the McHugh deposition, Mr. Wyant responded promptly. For example, on June 18, 2024, Panasonic contacted Mr. Wyant by email requesting "additional documents and information" about WCA's interactions with Mr. Senk. French-Brown Decl. ¶ 18. Panasonic listed six specific questions, including a request for the full name of the "Rob" mentioned in Mr. McHugh's email. *Id.* Exhibit 13. Mr. Wyant responded the next day, confirming that Mr. McHugh had been referring to Mr. Senk. Mr. Wyant expressed his correct view that, because Mr. Senk was a former Panasonic employee, it had been appropriate for Mr. McHugh to contact Mr. Senk. *Id.* Exhibit 14. He also noted that "WCA had no obligation to answer interrogatory questions posed in your letter . . . ." *Id.* Panasonic has not shown that this response constituted a refusal to provide information, rather than a request that Panasonic use formal interrogatories when seeking discovery. On August 27, 2024, when Panasonic reached out to WCA's outside counsel and requested more information, *id.* ¶ 24, a different lawyer for WCA responded that same day. The parties also met and conferred about the issue on September 6, 2024. *Id.* ¶ 26. Although WCA ultimately produced 82 additional documents relating to Mr. Senk and his September 2022 work on the aircraft, *id.* ¶ 30, that alone is insufficient to establish sanctionable conduct. Indeed, Panasonic has not sought sanctions under Federal Rule of Civil Procedure Rule

37.  Because Panasonic has not established that WCA's counsel violated the ethical rules or otherwise acted "in bad faith, vexatiously, wantonly, or for oppressive reasons," *Ransmeier*, 718 F.3d at 68, sanctions for this conduct are inappropriate.

### B.  Panasonic Has Not Established That Sanctions for Spoliation Are Warranted

#### 1.  WCA Had a Duty to Preserve the eXConnect and eX1 Systems as Panasonic Had Originally Installed Them

WCA had a duty to preserve the eXConnect and the eX1 Systems as Panasonic originally installed them because WCA was on notice that the manner in which the systems were installed was relevant to the breach of contract claims as pleaded at the time.  First, it is undisputed that the duty to preserve the systems had attached by the time Mr. Spethman commissioned the 2022 maintenance work because the lawsuit had been underway since 2020.  *See Kronisch*, 150 F.3d at 126 ("[The] obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed, providing the party responsible for the destruction with express notice[.]").

Second, WCA was obligated to "not destroy unique . . . evidence that it [knew], or reasonably should [have known], [was] relevant in the action."  *See Taylor*, 293 F.R.D. at 609–10.  The operative complaint at the time was the Amended Complaint.  The Amended Complaint alleged that Panasonic "breached the GTA by *failing to install* the eX1 and eXConnect systems in a fully working condition . . . ."  Amended Complaint ¶¶ 44–60 (emphasis added).  Therefore, how Panasonic installed the eX1 component parts and the eXConnect antenna was relevant to the lawsuit at the time.[13]  As plaintiff, WCA placed the method of installation of those systems at issue in its complaint.  Because WCA knew—or should have known—that the ways in which Panasonic

---

[13] The Amended Complaint also alleged that Panasonic failed to repair or replace the eXConnect and eX1 Systems, and later failed to provide the necessary upgrades pursuant to the parties' contract.  *See* Amended Complaint ¶ 47.

installed the components of each system were central to its claims at the time, WCA had a duty to preserve systems for "use as evidence in pending . . . litigation." *See Allstate Ins. Co.*, 473 F.3d at 457.

WCA argues that its duty to preserve was not "indefinite[]" and that Panasonic implicitly waived its right to inspect the eX1 and eXConnect Systems because it never requested an inspection of the aircraft before the systems were modified. This argument is unconvincing, however, because the deadline for Panasonic to make such a request had not yet passed when WCA worked on the aircraft. It is true that "the obligation to preserve evidence" is not "an obligation [that] continues indefinitely." *Allstate Ins. Co.*, 473 F.3d at 458 (finding that sanctioning the plaintiff was inappropriate because a representative of the defendant had "affirmatively disclaimed any interest in the evidence . . . after being provided a full opportunity to inspect the items"); *see id.* (quoting *Baliotis v. McNeil,* 870 F. Supp. 1285, 1290 (M.D. Pa. 1994)) ("'[T]he scope of the duty to preserve evidence is not boundless,' but requires, at a minimum, that the defendant be provided an opportunity for inspection . . . ."). However, here, unlike in *Allstate Ins. Co.*, the Court had ordered a case management plan pursuant to which the deadline for Panasonic to request to inspect the aircraft had not yet passed.[14] Consequently, the Court cannot conclude that Panasonic implicitly waived its right to inspect the aircraft.

### 2. Despite Its Duty to Preserve the eX1 System, WCA Disconnected Three of Its Component Parts

Despite WCA's duty to preserve the eXConnect System and the eX1 System as Panasonic originally installed them, WCA disconnected and reinstalled components of the eX1 System,

---

[14] Initially, fact discovery was to be completed by May 19, 2021, Dkt. No. 22, but the Court extended all deadline that month, so fact discovery was instead to be completed by August 2021. Dkt. No. 45. In August 2021, fact discovery was again extended to January 7, 2022. Dkt. Nos. 48, 49. Before the period for fact discovery expired, however, on September 29, 2021, the Court granted the parties' request to stay discovery. Dkt. Nos. 53, 58. Indeed, WCA acknowledges that, even after the stay was lifted, "[t]he parties obtained an extension of fact discovery until July 23, 2024, setting Panasonic's deadline to issue a Rule 34 inspection request at June 23, 2024." Opp. at 22. Had Panasonic affirmatively disclaimed its interest in inspecting the Aircraft, as in *Allstate Ins. Co.*, then WCA may have been free to work on the aircraft in the midst of the stay. 473 F.3d at 458. No such affirmative disclaimer occurred, however.

effectively destroying the evidence of the manner in which Panasonic originally installed those parts. *See, e.g.*, *Dahoda v. John Deere Co.*, 216 F. App'x 124, 126 (2d Cir. 2007) (summary order) (finding spoliation when plaintiffs' expert disconnected a switch that was connected to an allegedly defective tractor). As described above, the eX1 System is primarily comprised of two physical components: the content server and the aircraft interface.[15] *See* French-Brown Decl. Exhibit 8 at ECF page 6. In September 2022, Mr. Spethman hired Mr. Senk to "repair elements of the eX1 system in the Aircraft, which had not worked for years." Spethman Decl. ¶ 5; *see* Senk Decl. ¶ 9. Mr. Senk attempted to repair the system by swapping out the original content server and the original DVD player with spares. Senk Decl. ¶ 11; Spethman Decl. ¶¶ 4–8. Additionally, Mr. Ihle, one of WCA's senior aircraft maintenance crew members, disconnected and then reinstalled the aircraft interface unit. Ihle Decl. ¶ 4. Therefore, by swapping out the DVD player and the content server, and reinstalling the aircraft interface, WCA failed to preserve the eX1 System in its original condition and, in so doing, effectively destroyed evidence of Panasonic's initial installation.

Panasonic also contends that WCA failed to preserve the eXConnect System, but the record does not support that conclusion. There is no evidence demonstrating that WCA worked on eXConnect's antenna. *See* Spethman Decl. ¶ 6 ("Neither Mr. Senk nor WCA maintenance personnel performed any work on the Panasonic's internet connectivity system, which includes an antenna on the Aircraft, and is known as the eXConnect system.").[16] Mr. Senk's invoice only bills for work on the in-flight entertainment system and does not bill for work related to the eXConnect antenna.

---

[15] As explained earlier, the content server "functions as a data file server" that "contains programs such as interactive menus, media . . . movies, music, and games," and "handles all the on-demand applications available to passengers." *See* Panasonic eX1 Training Guide at ECF page 8. The aircraft interface is the main controller for the eX1 system. *See* Panasonic eConnect Training Guide at ECF page 8.

[16] Mr. Spethman explained that, "[i]f the eXConnect antenna had required repair work, we would have had to use heavy equipment to access parts on the exterior of the Aircraft," and "[w]e used no such equipment during Mr. Senk's visit and did not touch the antenna." Spethman Decl. ¶ 6.

Senk Decl. Exhibit C.[17]  Neither Mr. Senk nor Mr. Ihle asserts that they worked on the eXConnect

System.  Accordingly, Panasonic has not established that WCA altered the eXConnect System.

### 3.  WCA Was Negligent When It Disconnected Components of the eX1 System, Which in Effect Destroyed Evidence of Panasonic's Original Installation

Panasonic has also established that WCA acted with a sufficiently "culpable state of mind"

because Mr. Spethman, Mr. Ihle, and Mr. Senk—in attempting to repair the eX1 System—were

negligent when they disconnected and reconnected components of the eX1 System, thereby

destroying evidence of Panasonic's original installation.  As explained above, "[a] party may establish

a culpable state of mind by showing that the evidence was destroyed knowingly, even if without

intent to [breach a duty to preserve it], or negligently."  *ELG Utica Alloys, Inc.*,

2025 WL 1962141, at *9.  The failure to preserve evidence falls "along a continuum of fault—

ranging from innocence through the degrees of negligence to intentionality."  *See Taylor*, 293 F.R.D.

at 612 (citing *Reilly*, 181 F.3d at 267).

Here, Panasonic has established that the loss of evidence related to the installation of the

eX1 System was negligent.  At the outset, this case has none of the hallmarks of gross negligence

such as suspicious timing, discarding major components of equipment, or failing to document what

evidence was altered or destroyed.  *See Dahoda*, 216 F. App'x at 125 (citing *Reilly*, 181 F.3d at 267)

("[G]ross negligence constitutes showing of 'fault' that could warrant sanction of dismissal")).  For

example, there is nothing in the timing of the work that undermines WCA's good faith explanation

that Mr. Spethman, as a new manager, wanted to try to repair at least some functionality of the eX1

System ahead of an upcoming flight.  *See, e.g.*, *Residential Funding Corp.*, 306 F.3d at 110 (concluding

---

[17] Panasonic contends that pictures attached to a September 9, 2022, email with Mr. Senk "show antenna panels and wiring removed from the eXConnect system," but Mr. Spethman affirmed that his understanding of the photograph is that "those pictures were taken years before Mr. Senk's September 2022 visit and were provided for context."  *Id.* ¶ 7. Mr. Senk also does not assert that he worked on the antenna.

that the trial court "overlooked some evidence that could support a finding" of bad faith or gross negligence, namely, that "timing of the decision" to retain a vendor that lacked the capability to retrieve emails undermined the party's good faith explanation because the party retained the vendor after determining that it lacked the resources to do the job).  Here, there was nothing suspicious about the timing of the work.

Additionally, WCA did not outright destroy major components of the eX1 System in a grossly negligent manner.  *See Parks Real Est. Purchasing Grp.*, 2008 WL 11517121, at *1 (finding gross negligence when "major components" of an insured building at issue, "including the elevators and substantial portions of the heating, ventilation and cooling and electrical systems [] had been replaced and destroyed" by plaintiffs).  Rather, Mr. Senk swapped out two, discrete parts—the DVD player and the content server—with spares and retained the originals.  *See* Senk Decl. ¶ 11; Spethman Decl. ¶ 4.  The original aircraft interface remains installed in the aircraft.  Ihle Decl. ¶ 4.

Nor did WCA conceal or fail to document its work.  *See ELG Utica Alloys, Inc.*, 2025 WL 1962141, at *9 (affirming the district court's conclusion that the shredding of 23,000 pounds of documents was grossly negligent when there was no litigation hold, no record existed "as to what specific documents were destroyed" and there was "no system for tracking which documents were kept or removed from its storage facility.").  WCA logged the changes in its maintenance log, Ihle Decl. Exhibit A, and photographed the original DVD player and content server.  *See* Spethman Decl. ¶ 8.

Instead, each of these mitigating factors supports a finding of ordinary, rather than gross, negligence in the way in which WCA attempted its repairs, which led to the loss of evidence.  *See, e.g.*, *Wade v. Tiffin Motorhomes, Inc.*, 686 F. Supp. 2d 174, 195 (N.D.N.Y. 2009) (concluding that plaintiff was only negligent when its representatives offered a good faith reason for removing the piping and furnace from an RV that caught fire, namely that the RV was due to be

exposed to damaging, inclement weather and "several photographs were taken of the piping and furnace before the removal of those items").  Therefore, while Panasonic has demonstrated that WCA acted with a sufficiently culpable state of mind, it has not established that WCA was more than negligent.

### 4.  Panasonic Has Not Demonstrated that the Lost Evidence Would Have Been of Any Assistive Relevance

Finally, Panasonic has not "'adduce[d] sufficient evidence from which a reasonable trier of fact could infer [that] the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.'"  *Taylor*, 293 F.R.D. at 613 (quoting *Residential Funding*, 306 F.3d at 108–09).

To satisfy the "assistive relevance" prong in this case, Panasonic was required to produce sufficient facts demonstrating that the lost evidence—the method of the original installation of the content server, DVD player, and aircraft interface—would have supported its defense that it did not breach the GTA.  While the installation of the eX1 System was at issue in the Amended Complaint that was operative in September 2022, the Court has since dismissed those claims.  *See* Dkt. No. 67. Now, only one breach of contract claim remains, premised on two theories of breach.  The first theory of breach is that Panasonic allegedly failed to properly install the eXConnect System, namely, the antenna that provides internet.  Second Amended Complaint ¶ 61(a).  The second theory is that Panasonic allegedly failed to provide "all upgrades to the eX1 System then available" as of 2017. *Id.* ¶ 31(b).[18]  Accordingly, Panasonic needed to produce sufficient evidence for a reasonable trier of fact to infer that the original installation of the DVD player, the content server, and the aircraft interface would have supported Panasonic's defense that it properly installed the eXConnect

---

[18] The upgrades include "touch screens, Blu-ray players, audio speakers, LCD cabin monitors, cabin handsets, system remote controls and related software."  Second Amended Complaint ¶ 31.

antenna, and that it provided any necessary upgrades to the eX1 System. Panasonic has failed to carry its burden.

At the outset, as explained above with respect to the "culpable state of mind" element, Panasonic has not made a showing of bad faith or gross negligence "in the destruction or untimely production of evidence" that might "suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party," here, WCA. *See Residential Funding Corp.*, 306 F.3d at 109. Instead, as described above, WCA was merely negligent when it destroyed the evidence. Accordingly, Panasonic bears the burden to "affirmatively demonstrate" that the lost evidence would have been relevant and favorable to its defense. *See Orbit One Commc'ns, Inc.*, 271 F.R.D. at 439.

Panasonic has provided no facts suggesting that the original installation of those three disconnected parts would have demonstrated that the eXConnect internet system functioned properly, or that Panasonic provided the necessary eX1 upgrades. *See, e.g., Great N. Ins. Co. v. Power Cooling, Inc.*, 2007 WL 2687666, at *11 (collecting cases in which the movant failed to offer any "extrinsic evidence" of assistive relevance, such as deposition testimony, emails, or notes that tend to support the movant's view of the missing evidence). This lack of evidence is telling: Mr. Senk, who now works at Panasonic, observed at least the pre-maintenance installation of the content server and the DVD player because he is the one who swapped out those parts. He could have provided his sworn observations that the original DVD player and content server, as installed, supported Panasonic's position, but he did not. Nor has Panasonic adduced any evidence from the employees who originally installed the eX1 components indicating that they were installed correctly. Panasonic also made no effort to rebut Mr. Spethman's sworn assertion that neither the eX1 System nor the eXConnect System functioned prior to the 2022 maintenance. *See* Spethman Depo. Tr. 13:10-13; Spethman Decl. ¶ 5 (explaining that Mr. Spethman invited Mr. Senk to come to Missoula,

Montana to work on the aircraft and "advise on how [WCA] could repair elements of the eX1 system in the Aircraft, which had not worked for years."). While the Court recognizes that "'care should be taken' not to require too specific a level of proof," of assistive relevance, *Kronisch*, 150 F.3d at 128, Panasonic has provided none. Under these circumstances, spoliation sanctions are not warranted.

## IV.    CONCLUSION

Panasonic's motion for sanctions is DENIED. Panasonic also filed a motion to seal two exhibits to the French-Brown Declaration because WCA had previously marked the exhibits as confidential. Dkt. No. 197. WCA consents to the public disclosure of both documents. Dkt. No 200.

The Clerk of Court is directed to change the viewing level on Dkt. Nos. 198, 199 so that they can be viewed by the public as well as the parties and the Court. The Clerk of Court is also directed to terminate the motion pending at Dkt. Nos. 191, 197.

SO ORDERED.

Dated: July 25, 2025
New York, New York

_____
GREGORY H. WOODS
United States District Judge